(No. 58110.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. STANLEY ASH *et al.*, Appellees.

*Opinion filed May 25, 1984.—Modified on denial of rehearing September 28, 1984.*

Neil F. Hartigan, Attorney General, of Springfield, and Randy Patchett, State's Attorney, of Marion (Mark L. Rotert and Ellen M. Flaum, Assistant Attorneys General, of Chicago, and Stephen E. Norris and Raymond F. Buckley, Jr., of the State's Attorneys Appellate Service Commission, of Mt. Vernon, of counsel), for the People.

Randy E. Blue, Deputy Defender, and Daniel M. Kirwan, Assistant Defender, of the Office of the State Appellate Defender, of Mt. Vernon, and A. Jeffrey Weiss, of Roslyn Heights, New York, for appellees.

JUSTICE WARD delivered the opinion of the court:

The defendants, Stanley Ash and Phillip Helton, were convicted after a jury trial in the circuit court of Williamson County of armed robbery, home invasion and unlawful restraint. Ash was sentenced to serve concurrent terms of 30 years for armed robbery and home invasion,

and three years for unlawful restraint. Helton was sentenced to serve concurrent terms of 20 years for armed robbery and home invasion, and two years for unlawful restraint. The appellate court, in a Rule 23 order (87 Ill. 2d R. 23), reversed Ash's conviction on the ground that the State failed to prove guilt beyond a reasonable doubt. The court reversed Helton's conviction and remanded for a new trial, holding that there was not effective assistance of counsel. (112 Ill. App. 3d 1175.) We granted the State leave to appeal under Rule 315 (87 Ill. 2d R. 315).

Ash and Helton were indicted along with Bennett Brown and Robert Phelps for the above-stated offenses. Brown was tried with the defendants, but was acquitted of all charges. Phelps entered a negotiated plea of guilty to two counts of armed robbery and was given concurrent sentences of six years on each count. He offered to testify in behalf of the prosecution, and the State dismissed the remaining charges against him. Each defendant was represented by his own attorney throughout the proceedings.

On January 3, 1980, Brenda Mosley was watching television in the house she shared with John Marczewski. Marczewski was not home, but a friend, Paulette Crosson, was with her. Shortly after 8 p.m., two men knocked on the back door and asked for Marczewski, saying they wanted to buy drugs. Mosley knew neither of the men and asked them to leave. The men refused and forced their way into the living room. One man pulled a tire iron from beneath his coat and the other brandished a knife. They tied the women with tape and forced them to the floor. The two men struck, kicked and threatened the women. The man with the tire iron then untied Mosley and asked her to show him where valuables were located. Marczewski came home about 8:30 p.m. and opened the front door. The robbers yelled

at him, demanding money. Marczewski ran and hid in the front yard of a house across the street. The men fled, taking with them some jewelry, about $800 in cash, two bags of marijuana, some sticks of explosives, and a handgun.

Crosson and Mosley freed themselves and ran to the house of a neighbor, Candace Emery. Emery testified that she went to her porch and saw a small yellow car slow down and then stop in front of her house. Emery observed the license number and called it out to her husband, who phoned the police. Marczewski, from his hiding place, observed a yellow Monza auto cruise down the street. Two men entered and the car drove away. He did not observe the license plate, and could not identify either of the men.

Another neighbor, Wayne Richardson, testified that around 8 p.m., he observed a red Corvette auto park across the street from his house. Two men, whom he could not identify, left the car and walked toward Marczewski's house. Approximately 15 minutes later, Richardson saw a small, light-colored car drive up in front of his house and leave off two men who entered a red Corvette and drive away.

When police questioned the two victims at the scene, they said that the man with the tire iron had light-colored hair and wore a long tan coat, jeans, brown boots and a ski hat. The man with the knife had dark hair and wore a long tan coat, ski hat, blue jogging pants with red and white stripes, and tennis shoes.

Later that evening, detectives stopped a small yellow car with the same license number reported at the crime scene. The occupants, the defendant Helton and Robert Phelps, were arrested. After the car was impounded, a search disclosed a tire iron found on the passenger-side floorboard, two long tan overcoats and a black gym bag bearing Helton's name, which contained two bags of

marijuana and two sticks of explosives. Items of jewelry, later identified by Mosley as stolen from her, were discovered in Helton's pocket after a station house inventory of his personal effects. A statement was taken from Phelps. It named defendants Ash and Helton as the men who invaded Mosley's house. Ash was arrested on January 8, 1980. He was wearing blue jogging pants with red and white strips and was driving a red Corvette.

On January 4, 1980, the day following the arrest of Helton and Phelps, Mosley and Crosson viewed "mug books" of photographs to try to identify their assailants. Mosley could not pick out anyone, but Crosson selected two photographs of persons who, she said, looked like the intruders. These, however, were not photographs of Helton or Ash but, as was learned later, one of the photographs was that of Phelps. Although all of the defendants were in custody after January 8, 1980, no lineup of them was ever held. In early May of 1980, the prosecutor reinterviewed Crosson and Mosley. They stated that they might be able to identify the intruders if they saw them in person. At this point, none of the defendants had been positively identified by Crosson or Mosley as the robbers.

Later, on May 15, 1980, a hearing was had on a motion the defendants Ash and Helton had made to suppress any identification which might be made of them prior to or at trial. In chambers prior to the hearing, the defendants argued that since no identification of them had been made as yet, any attempt by the victims four months after the defendants' arrests to make an identification would constitute an improperly suggestive show up. To eliminate suggestiveness at the hearing, the defendants at the judge's order were seated, not at the counsel table, but in the spectator section of the courtroom.

Crosson and Mosley were sworn and asked if they

saw anyone in the courtroom they could identify as the robbers. Mosley could not make any identification and later at trial did not identify either defendant. Crosson while seated on the witness stand was unable to identify anyone. She then stepped to the railing in front of the spectator section and identified Helton as the assailant who brandished the tire iron. When asked if she could identify the other assailant, Crosson pointed first to a man in the courtroom who she said "might be" the intruder with the knife, but the man proved to be an attorney seated in that section. She then pointed to a second man who might be the intruder, but he was also an attorney. The prosecutor then pointedly asked Crosson if the man she picked was wearing glasses. He was not. Crosson then picked Ash who was seated next to the second man and who was wearing glasses. Crosson identified Ash and Helton at trial.

As stated, Phelps agreed to testify against his codefendants. He was seeking the dismissal of some of the charges, a lenient sentence, and to avoid being sent to the prison where individuals that he had testified against in a 1976 prosecution were confined. His cross-examination disclosed that these individuals had "put out a contract" on Phelps' life, and, he testified, he "would do just about anything" to avoid being incarcerated with them. When Phelps was called to testify, he refused to answer any questions, pleading the fifth amendment. He did agree to testify after the State filed a motion to set aside his negotiated plea of guilty.

Phelps testified that on January 3, 1980, at about 1 p.m., he and Helton met Ash and Brown at a bar in West Frankfort. They proceeded to one Rick Stewart's house. He took them to several jewelry stores where they attempted to sell a ring. Thereafter they left Stewart, and the four decided to go to Carterville to buy drugs. There Phelps and Brown dropped off Helton and

Ash at a house, and Phelps, driving Helton's yellow Monza, came back about 20 minutes later and picked up Ash and Helton. Only later, he said, he learned from Helton that they had committed the robbery. The proceeds of the crime were divided among the four. Helton claimed two bags of marijuana, two sticks of explosives and apparently, part of the cash and jewelry. The remainder were apparently divided between Brown and Ash, and Phelps later accepted $275 from Helton as his share.

Richard Stewart was called by the State to testify. He corroborated Phelps' testimony regarding meeting with the four on January 3, 1980, and their attempt to sell a ring. He also testified that, while riding around, Ash had twice proposed to Helton, Brown and Phelps that they steal some money and drugs in Carterville. Stewart's cross-examination revealed that he had used four different aliases and his criminal record included a number of convictions for theft. When Stewart was asked to identify Ash, he stated that he did not see him in the courtroom. Ash was seated at the counsel table at the time.

Neither Brown nor Ash took the stand, but Helton did testify. He stated that on January 3, 1980, he was at a bar in Marion, Illinois, when Phelps borrowed his yellow Monza at about 8 p.m. He returned the car shortly afterwards, and when Helton entered his car he saw jewelry on the passenger-side floorboard. Assuming the jewelry was his girl friend's, he put it in his pocket. He testified that he knew nothing about the drugs and explosives found in his duffle bag. It was brought out on cross-examination, that Helton was convicted of subornation of perjury in 1975.

An issue here is whether the evidence was sufficient to show Ash guilty beyond a reasonable doubt. Quoting from *People v. Jordan* (1954), 4 Ill. 2d 155, 156, we recently stated that " 'it is our duty, where a verdict of

guilty is returned by a jury *** not only to carefully consider the evidence but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged.' " (*People v. Bartall* (1983), 98 Ill. 2d 294, 305-06.) The appellate court held, here, that the State failed to sustain its burden of proving Ash's guilt and it reversed his conviction. The State argues that the court improperly rejected the accomplice testimony of Phelps and erroneously substituted its judgment in place of the trier of fact in its appraisal of Crosson's identification of Ash.

While uncorroborated testimony of an accomplice can be a sufficient ground on which the trier of fact may base a conviction (*People v. Pittman* (1973), 55 Ill. 2d 39; *People v. Hermens* (1955), 5 Ill. 2d 277), it is testimony that must be cautiously scrutinized on appeal (*People v. Baynes* (1981), 88 Ill. 2d 225; *People v. Wilson* (1977), 66 Ill. 2d 346; *People v. Gleitsmann* (1935), 361 Ill. 165). This court has also held that, where a witness has hopes of reward from the prosecution, his testimony should not be accepted unless it carries within it an "absolute conviction of its truth." *People v. Williams* (1976), 65 Ill. 2d 258, 267.

There was not an absolute conviction of truth in the accomplice testimony of Phelps. Phelps was seeking a lenient sentence and not to be incarcerated with the three criminals against whom he had testified earlier. On cross-examination, Phelps admitted that he would "do just about anything" to avoid imprisonment with them and freely acknowledged that he would lie to save his life. Too, Phelps elected to testify only after the prosecution threatened to rescind the agreements that had been negotiated.

In addition, testimony which supposedly corroborated

Phelps' described only certain events surrounding the crime but not who committed it. (*People v. Wilson* (1977), 66 Ill. 2d 346.) Stewart's testimony regarding the attempt on January 3, 1980, to sell a ring did not implicate Ash as one of the robbers. Although Stewart testified that he had been with Ash, remarkably, he said he could not identify Ash, who was seated at the defense table throughout the testimony.

The State argues that Barbara Crosson's identification of Ash is sufficient to support the conviction. It is true that a positive identification by a single witness who had an ample opportunity to observe is sufficient to support a conviction. (*People v. Tate* (1981), 87 Ill. 2d 134; *People v. Jones* (1975), 60 Ill. 2d 300.) There was not a positive identification of Ash by Crosson, however.

She first described the man who had the knife as six feet, three inches tall, with dark hair and a mustache, and wearing a blue jogging suit, white tennis shoes, and a long tan coat. On January 4, 1980, the day after the robbery, Crosson viewed several "mug shots" one of which was of Ash, but failed to pick out Ash. Ash's police photo shows that he is only five feet, nine inches tall, a discrepancy of six inches. Furthermore, although all the defendants were in custody commencing January 8, 1980, Crosson and Mosley did not view any of them until May 15, 1980, more than four months later. The record does not explain why a lineup was never held.

At the hearing on May 15, 1980, Crosson misidentified two attorneys seated in the spectator section as Ash. Only after prompting did she point to Ash.

A conviction cannot be deemed to be sustained beyond reasonable doubt by the evidence if identification of the accused was vague and doubtful. (*People v. Gardner* (1966), 35 Ill. 2d 564, 571; *People v. Cullotta* (1965), 32 Ill. 2d 502, 504; *People v. Hister* (1974), 20 Ill. App. 3d 933, 937.) Crossons' identification of Ash was insuffi-

cient to support a conclusion that Ash was guilty beyond a reasonable doubt.

The second issue we consider is whether defendant Helton was denied effective assistance of counsel because of a conflict of interest on the part of his attorney. His attorney had been appointed as a special prosecutor in a traffic matter, and when he recalled that he had been appointed, he had the order of appointment vacated. On the basis of our decision in *People v. Fife* (1978), 76 Ill. 2d 418, the appellate court considered there was a conflict of interest and reversed Helton's conviction.

In *Fife*, the defendant was convicted of the unlawful delivery of cannabis. The defendant's attorney was at the time serving as a special assistant attorney general, in workers' compensation cases. This court reversed the conviction because of pressure, though only subliminal, that the defense counsel might be under from serving the conflicting interests of the Attorney General of Illinois and the defendant.

The right to effective assistance of counsel is assured by the sixth and fourteenth amendments to the United States Constitution, and by article I, section 8, of our constitution. (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *People v. Echols* (1978), 74 Ill. 2d 319.) This right also gives an accused the right of representation free from conflicting interests and entitles him to the undivided loyalty of his counsel. *People v. Coslet* (1977), 67 Ill. 2d 127; *People v. Kester* (1977), 66 Ill. 2d 162.

The holding in *Fife* is not in point. Here the attorney had not been appointed by the State's Attorney. He had been appointed by the circuit court, as the defendant's attorney acknowledged in oral argument before us. The defense attorney in *Fife* had been appointed by the Attorney General and worked directly for him. In *Fife*, the

Attorney General's internal code of conduct recognized the potential for conflict-of-interest situations. Part-time staff members and special assistant attorneys general were prohibited from representing defendants in criminal cases unless an exception was granted by the Attorney General. 76 Ill. 2d 418, 421.

None of the conflicts perceived in *Fife* or in *People v. Stoval* (1968), 40 Ill. 2d 109, *People v. Coslet* (1977), 67 Ill. 2d 127, *People v. Kester* (1977), 66 Ill. 2d 162, or *People v. Washington* (1984), 101 Ill. 2d 104, are present here.

For the reasons given, the portion of the judgment of the appellate court which reversed Ash's conviction is affirmed. In reversing Helton's conviction and remanding for a new trial on the ground that he did not receive the effective assistance of counsel, the appellate court did not consider the other contentions of error made by Helton. Accordingly, we reverse the portion of the judgment which reversed Helton's conviction and remand the cause to the appellate court for its consideration of Helton's remaining contentions.

*Affirmed in part and reversed in part; cause remanded, with directions.*