THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERRICK WHEELER, Defendant-Appellant.

Third District   No. 3—08—0208

Opinion filed May 12, 2010.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

James Glasgow, State's Attorney, of Joliet (Terry A. Mertel, Robert J. Biderman, and John Teefey, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SCHMIDT delivered the opinion of the court:

A jury found defendant, Derrick Wheeler, guilty of first degree murder. Thereafter, the circuit court sentenced defendant to a term of 34 years in the Department of Corrections. Defendant appeals, arguing that: (1) he was not proven guilty beyond a reasonable doubt; and (2) he was deprived a fair trial due to counsel's failure to tender a jury instruction regarding testimony of an accomplice. We reverse and remand for a new trial.

## BACKGROUND

On September 10, 1997, defendant was charged in a two-count indictment with first degree murder. 720 ILCS 5/9—1(a)(1), (a)(2) (West 1996). A jury found defendant guilty of count I and the circuit court sentenced him to a 48-year term of imprisonment.

Defendant filed a direct appeal and the appellate court remanded the cause to the trial court for a hearing to determine the degree to which Leuco-Malachite Green (LMG) testing was accepted in the scientific community. The reviewing court retained jurisdiction pending the outcome of that hearing. In a supplemental opinion following the hearing, this court again reversed and remanded the case, holding that, at least in the absence of visible evidence of blood, LMG testing was not generally accepted in the scientific community as a means of raising a presumption, rather than just a possibility, that blood was present. *People v. Wheeler*, 334 Ill. App. 3d 273, 777 N.E.2d 961 (2002).

On January 29, 2007, jury selection began on defendant's second trial. During direct examination of the State's first witness, a response was made referring to defendant's "last trial." The bailiff made the court aware that one of the jurors had picked up on the comment and had asked the bailiff if something was going to be done. Based on this development, the court granted defendant's request for a mistrial.

On January 30, 2007, a new *voir dire* commenced. Following testimony and during jury deliberations on February 2, 2007, a number of notes were sent to the court, including one that stated the jurors were unable to reach a verdict. In response, the court read the *Prim* instruction to the jury. Following additional notes, the court ultimately declared a mistrial on February 6, 2007, when the jurors indicated they were hopelessly deadlocked.

The jury selection for defendant's fourth trial began on November 13, 2007. The trial commenced the following day. After opening statements, the State called Jacque Buckley as its first witness. Buckley testified that he had known Monte Love, the victim, for 15 to 20 years and was with Love on the day he was murdered. Buckley and defendant rode together to defendant's house, where a man named "Peanut" (who is now deceased) and "some girl" were hanging out. Buckley explained that while they were at defendant's house, "Peanut" and the girl began making "fake dope." Buckley acknowledged he was no stranger to drugs and had convictions for possession of controlled substances in 1997, 1999, and 2002.

Eventually, defendant, Buckley, and Love left defendant's house and drove around the neighborhood attempting to sell the fake drugs. Buckley testified that he was driving defendant's car and that Love announced he had to use the bathroom. Buckley pulled the car to the side of the street underneath I-80. Love exited the car and moved toward the rear of the vehicle. Defendant also exited the car. Buckley heard two "pops" that startled him and caused him to lurch the car forward. Defendant then jumped back into the car and Buckley saw defendant holding a gun, which he then placed into a bag. Buckley also noticed a woman, who was out walking a dog, looking at them.

Defendant told Buckley he was "straight" and Buckley then drove the car back to the neighborhood. He saw Love lying on the ground as they drove away. Buckley then stopped near a key store, and defendant exited the car and went inside the store. Buckley testified he was scared and confused and that defendant never told him what the shooting was all about. Buckley then gave defendant the car keys and caught a ride with another friend to his grandmother's house.

After the shooting, Buckley tried to avoid police because he simply did not want to talk about the incident. He eventually spoke to the police when he was locked up on another case in the Will County jail. He denied that he asked for a deal from the police or that any deal was offered. During the interview, Buckley told the police the same information that he testified to. He then identified People's exhibit No. 5 as a photograph of defendant's vehicle that he was driving on the day in question and People's exhibit No. 4 as a photograph of Love.

During cross-examination, Buckley testified that while in jail on unrelated charged, he refused several requests by the police to talk with him. He did not know what they wanted to talk to him about and, at the time, he was very involved in selling drugs. Buckley acknowledged that although the police never offered him anything, he believed someone from the State's Attorney's office offered him immunity. At that time, Buckley claimed it was unclear as to whether the immunity extended to his involvement in Love's murder or to the charge he was then incarcerated for. He acknowledged asking the assistant State's Attorney (Patton) if he could get a bond reduction on his current case and she declined. On redirect, Buckley stated that although there was no deal in place at the time he spoke to police, he was ultimately granted immunity for the killing of Love and received probation on the other case pending against him.

Camille Sharp testified that at approximately 7:30 a.m. on January 18, 1997, she went outside to walk her dog and noticed a man urinating alongside a car about 80 feet away under the I-80 overpass. She then saw a second man exit the car and get behind the first man. He brought a gun up, pointed it to the back of the man's head, brought it down briefly to fix it, and then put it back up to his head. He shot the man in the back of the head and then fired two additional shots. At the same time, she saw the vehicle lurch forward. She observed the shooter bend down and either place something on or remove something from the victim's chest. The shooter then reentered the car. She could not identify the shooter because of the distance, but described him as African American, wearing a do-rag, a black basketball-like shirt with blue numbers, and black baggy pants.

Sharp then ran back to her house and dialed 911. According to Sharp, the vehicle was a four-door, older model, white, cream-colored with a vinyl top that was a bit darker than the rest of the car. She was taken by the police to view several cars, but admitted she could not identify any of the vehicles.

Nicholas Peterson testified that he was currently in the custody of the Department of Corrections. Peterson pled guilty to aggravated criminal sexual assault, burglary, robbery, and armed robbery without a firearm. He explained that he was familiar with defendant and identified him in the courtroom. While incarcerated with defendant, defendant told him that he got into an argument with "one of the guys" regarding drugs and then shot the man from the car. The victim was a member of the Gangster Disciples.

Investigators questioned Peterson and he told them the same information that he testified to in court. Peterson also claimed that defendant told him that he was going to try and pay off the witnesses. Peterson admitted that he had known about this information for some time, but never made any effort to contact anyone. He did not want to testify in this case because he only had eight more years left, and "it's going to get out that [he] did this." During a meeting with the prosecutor, Peterson asked if they would speak on his behalf when his case came up for parole, and they agreed.

Sheriff investigator Daniel Procarione testified that on August 31, 2006, he, along with investigator Mike Kelly, interviewed Peterson at the Department of Corrections facility at Big Muddy. During the interview, Peterson detailed conversations he had with defendant. Defendant told Peterson he had shot someone from a car because of a dispute over drugs.

Retired police officer James Kren then testified that on June 18, 1997, he responded to a call around 7:30 a.m. He was the first to arrive at the scene and saw a body lying under the I-80 overpass. He identified several photographs depicting the scene.

A second retired police officer, Louis Bolognami, testified that on June 18, 1997, he was the evidence technician at the scene. He identified several photographs of the scene and stated he recovered two bags containing a white rocky substance, one on top of the body and one in the deceased's left hand. Shell casings, as well as tire impressions that were suitable for comparison, were also recovered.

Reginald Brown, a friend of the deceased, saw Love drive by with two other people in the car on the morning of June 18, 1997, at around 7 a.m. Although Love generally stopped, he did not on that particular morning. Brown did not recognize the other two men in the vehicle.

Evidence technician William Smith stated that he examined the car that had been brought in to the Joliet police department. He identified People's exhibit No. 5 as a photograph of the car he processed. The examination of the vehicle occurred about three months after the shooting. The car appeared clean and no definitive evidence was found. One of the tests performed was the Leuco-Malachite green spray, which was a tool investigators used when looking for blood. Smith sprayed the inside panel of the rear door and there was only one very small spot that gave a reaction. Smith conceded that the test done to the door panel was merely a tool and the spray reacted to other things as well, including red lead paint and potato juice. He did not know for certain how many other substances would react to the spray and, therefore, the results could provide no definitive evidence. Here, because the spot was so small, the witness stated he was unable to proceed with further testing.

Officer Steve Bajt testified that he had been a police officer for the city of Joliet for almost 24 years. Bajt was assigned to investigate the homicide in this case. His investigation eventually led him to interview Buckley at the Will County court adult detention facility. Buckley was not promised anything for his information and gave his information voluntarily. Based on the information provided by Buckley, Bajt then interviewed defendant.

Bajt took defendant into custody, and defendant claimed that he did not know anything about a shooting and did not know the victim, Monte Love. Defendant was shown a picture of the victim, and he responded, "that's Demonstration Man." Defendant said that Love had been in his car and that he dropped him off "at the first set of projects" on the day he was killed. Defendant explained that he found out that Love had been murdered a day after his death.

According to defendant, the victim came over to his house wanting to buy marijuana. Defendant did not have any marijuana, and Love asked him for a ride to the projects. Defendant had a suspended driver's license, so Buckley drove defendant's car. After they arrived at the projects, the victim exited the car and walked away. Defendant then stated that he and Buckley went to see a girlfriend, who was not home, and when they returned to the car, it would not start. Buckley allegedly left and got a ride with someone else in the area.

When Bajt asked defendant to repeat this story, defendant was consistent except for the ending of the story. During the second version, defendant said that after the car would not start, both he and Buckley went back to defendant's house, got a battery, fixed the car, and drove off. Defendant also admitted to the officers that he had sold fake dope in the past.

During cross-examination, Bajt stated that the original description of the vehicle seen at the shooting was provided by Camille Sharp. The vehicle was described as a beige-colored, boxy-styled, four-door car, with a vinyl top. During the course of his investigation, there were calls regarding four to six vehicles matching that description. Sharp, however, was unable to identify any of those and was also not able to identify defendant's former vehicle. Brown also described the vehicle he observed Love in the day of the shooting as having a vinyl top. Defendant's vehicle, however, did not have a vinyl top.

Following Bajt's testimony, several stipulations were entered into evidence: (1) Dr. Shaku Teas, an expert in forensic pathology, would testify that the victim in this case "died of multiple gunshot wounds with no other contributing factors"; (2) Paul Titus, a forensic chemist, would testify that the baggies on the victim's body did not contain a controlled substance; (3) Alisa Skinner, a forensic scientist, would testify that the tire impressions at the scene of the murder were not made by the tires removed from defendant's car three months after the murder; and (4) D. David McCalle, yard master and keeper of records for the Burlington Northern and Santa Fe Railroad, would testify that on June 18, 2007, at 7:24 a.m., a train passed through the Joliet Yard and, at 7:35 a.m., the train crossed the Plaines Junction. The State then rested its case.

Following closing arguments, the jury found defendant guilty of first degree murder. Thereafter, the circuit court sentenced defendant to 34 years in prison. Defendant filed a motion for a new trial, which was denied. This appeal followed.

## ANALYSIS

■ Defendant first argues that he was not proven guilty beyond a reasonable doubt where the State's key witness was involved in the offense, obtained immunity for his testimony, and had previous felony convictions, and where there was no physical evidence linking defendant to the offense. The applicable standard of review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of first degree murder were proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217, 780 N.E.2d 669, 685 (2002).

It is well established that the testimony of an accomplice must be cautiously scrutinized on appeal. *People v. Ash*, 102 Ill. 2d 485, 493, 468 N.E.2d 1153, 1156 (1984). Morever, when it appears that a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of truth. *Ash*, 102 Ill. 2d at 493, 468 N.E.2d at 1156; *People v. Williams*, 65 Ill. 2d 258, 267, 357 N.E.2d 525, 530-31 (1976). Nevertheless, the weight

to be given to a witness's testimony, the witness's credibility, and the reasonable inferences to be drawn from the evidence are all the responsibility of the fact finder. *People v. Hensley*, 354 Ill. App. 3d 224, 228, 819 N.E.2d 1274, 1279 (2004).

Defendant cites to *People v. Kiel*, 75 Ill. App. 3d 1030, 394 N.E.2d 883 (1979), in support of his argument. In *Kiel*, the defendant's conspiracy to commit murder conviction was reversed where the sole witness who incriminated her was an accomplice, and the witness failed to reveal his story for nearly two years after the incident. Further, the witness did not accuse the defendant until he was arrested for robbery. Initially, at the preliminary hearing, the witness claimed that he had no recollection of the offense, his testimony was inconsistent with other statements, and he admitted to using drugs when the events at issue took place. In light of these circumstances, the appellate court found the witness's testimony was "inherently unworthy of belief" and the defendant's conviction was reversed. *Kiel*, 75 Ill. App. 3d at 1036, 394 N.E.2d at 887.

Defendant contends that, just as in *Kiel*, the State's star witness lacked credibility. First, defendant argues that Buckley's admitted friendship with the victim makes his testimony suspect. See *People v. Roman*, 248 Ill. App. 3d 1085, 1086, 618 N.E.2d 786, 788 (1993) (bias may be demonstrated where witnesses implicating defendant are friends with the victim). Second, Buckley's testimony is subject to scrutiny in light of the fact he received a deal in exchange for testifying against defendant. Finally, defendant asserts that a witness's background as a convicted felon seriously diminishes his credibility. See *People v. Paul*, 304 Ill. App. 3d 404, 411, 710 N.E.2d 499, 504 (1999).

*Kiel*, however, is distinguishable from the present case. Here, Buckley was not the only witness to the crime. The State presented testimony from an eyewitness and from a witness who saw the victim drive by in the backseat of a vehicle around the area and the time of the incident. Officer testimony established that the prior statements given by the various witnesses were consistent with the witnesses' testimony at trial. Furthermore, Nicholas Peterson testified that while incarcerated, defendant told him that he had shot a man over an argument regarding drugs.

Although defendant attempts to discredit Buckley's testimony on appeal, the jury was well aware and fully informed of Buckley's background. Given this information, it was the jury's duty to determine the weight to be given Buckley's testimony and his credibility. *People v. Jimerson*, 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903 (1989).

Moreover, the State contends that there was no evidence that Buckley was an "accomplice" in this case. In other words, there was no

evidence that Buckley, "knowingly, voluntarily, and with common interest unite[d] with the principal offender in the commission" of the murder in this case. *People v. Travis*, 94 Ill. App. 3d 983, 991, 419 N.E.2d 433, 440 (1981). The only evidence that placed Buckley at the scene of the murder was his own testimony. Mere presence at the scene of the crime is not sufficient to make Buckley an accomplice. See *People v. Redmond*, 341 Ill. App. 3d 498, 512, 793 N.E.2d 744, 756 (2003).

Alternatively, the State contends that even if the jury believed Buckley was an accomplice, his testimony was still credible as it was corroborated by other witnesses. Both Reginald Brown's and Camille Sharp's testimony corroborated the time line, the area, and the method of the murder. "While it is true that testimony of a witness who is an accomplice is to be viewed with suspicion and is to be viewed by the jury with caution, it is also clear that such evidence, if it is enough to convince the jury beyond a reasonable doubt, is sufficient to sustain a conviction." *People v. Williams*, 70 Ill. App. 3d 489, 493, 388 N.E.2d 1095, 1098 (1979).

Defendant next points to the fact there was no physical evidence linking him to the offense. Neither defendant nor the State provides any case law as to the importance or unimportance of physical evidence. Instead, defendant relies on the conflicting testimony regarding the physical appearance of defendant's car, the fact there was no physical evidence found in defendant's car, and the fact that the tire impressions from the scene that were taken to the crime lab for analysis did not match the tires on defendant's car three months after the incident.

In our view, neither the lack of physical evidence nor the minor inconsistencies between the testimony of the witnesses render the evidence so unreasonable, improbable, or unsatisfactory as to justify this court's reversal of the jury's determination that defendant is guilty beyond a reasonable doubt. See *People v. Howard*, 209 Ill. App. 3d 159, 174, 568 N.E.2d 56, 65 (1991). The jury was in the best position to judge the credibility of the witnesses. The jury was aware of all of the evidence used to impeach the witnesses, and it was its duty to assess the witnesses' credibility in light of those impeaching factors. *Hensley*, 354 Ill. App. 3d at 228. In doing so, the jury found Buckley, Peterson, Sharp, and other State witnesses to be credible. For the foregoing reasons, we find defendant was proven guilty beyond a reasonable doubt.

## Jury Instruction

Defendant next argues that defense counsel was ineffective for failing to submit an accomplice-witness instruction. In order to

establish a claim of ineffective assistance of counsel, a defendant must show both a deficiency in counsel's performance and prejudice resulting from the deficiency. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). Deficient performance may be shown by demonstrating that counsel's performance fell below an objective standard of reasonableness, whereas prejudice will only be found where there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *People v. Makiel*, 358 Ill. App. 3d 102, 108, 830 N.E.2d 731, 737 (2005).

Specifically, defendant contends defense counsel should have tendered Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000) (hereinafter IPI Criminal 4th), which states:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

■ Our supreme court has stated that the pattern accomplice-witness jury instruction should be given if the totality of the evidence and the reasonable inferences that can be drawn from the evidence establish probable cause to believe that a witness participated in the commission of a crime. *People v. Campbell*, 275 Ill. App. 3d 993, 997, 657 N.E.2d 87, 90 (1995); *People v. Henderson*, 142 Ill. 2d 258, 314-15, 568 N.E.2d 1234, 1261 (1990), *cert. denied*, 502 U.S. 882, 116 L. Ed. 2d 189, 112 S. Ct. 233 (1991). If this test is satisfied, the defendant is entitled to an accomplice instruction even if the witness denies involvement in the crime. *People v. Lewis*, 240 Ill. App. 3d 463, 466, 609 N.E.2d 673, 676 (1992).

■ Again, the State argues that there was no evidence presented that Buckley was an accomplice. We disagree. Although mere presence at the scene of the crime is not sufficient to establish accomplice liability, Buckley testified that he drove defendant to the scene, he was present at the scene of the shooting, and he drove defendant away from the scene. See *People v. Redmond*, 341 Ill. App. 3d 498, 512, 793 N.E.2d 744, 756 (2003). Moreover, after the incident, Buckley was aware that police were attempting to contact him and actively avoided them.

The State contends that the instruction was not necessary, given that Buckley's testimony was corroborated by other witnesses and the jury was aware that Buckley had been offered immunity for his testimony against defendant. See *People v. Lewis*, 240 Ill. App. 3d 463, 609 N.E.2d 673 (1992). In *Lewis*, the appellate court found that defense counsel erred by failing to tender Illinois Pattern Jury Instructions,

Criminal, No. 3.17 (2d ed. 1981). The court, however, found that this error alone did not require reversal since the jury was instructed that in determining the credibility of witnesses, it should consider any interest, bias or prejudice the witness might have. *Lewis*, 240 Ill. App. 3d at 467-68. Likewise, in this case, the jury was instructed that in determining Buckley's credibility it should consider "any interest, bias or prejudice he may have."

Unlike *Lewis*, we find that defense counsel's error in failing to tender the instruction was not harmless since the evidence was closely balanced and the State's case rested upon Buckley's credibility as its key witness. Without Buckley's testimony, there were no witnesses who could identify defendant's car, no witnesses who could identify defendant as the shooter, and no physical evidence presented to link defendant to the crime. Although another witness testified that he saw the victim in the backseat of a car on the same morning as the offense, he could not identify who the driver or the passenger was. Additionally, the State's other eyewitness could not identify defendant as the shooter or defendant's car. Finally, defendant's cell mate, who entered a plea of guilty to aggravated criminal sexual assault, burglary, robbery, and armed robbery without a firearm, was promised help with his parole in exchange for his testimony.

We believe that the evidence and the reasonable inference to be drawn from it dictate that an accomplice-witness instruction should have been tendered to the court by trial counsel. We find that this instruction goes far beyond the instruction relating to the credibility of witnesses in general. Had the accomplice-witness instruction been given, the jury would have been compelled to examine Buckley's testimony with close scrutiny. Due to the fact that the State's case hinged on Buckley's testimony, we find that this deficient performance so prejudiced the defense as to deny the defendant a fair trial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. We find that had the instruction been given, there is at least a reasonable probability that the result would have been different. Defendant's conviction is reversed, and this cause is remanded for a new trial.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Will County is reversed and the cause is remanded.

Reversed and remanded.

CARTER and LYTTON, JJ., concur.