2021 IL App (2d) 190044-U
No. 2-19-0044
Order filed July 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-2816 |
| ALEXANDER W. MENDEZ, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*: Although the victim was unable to positively identify defendant, there was sufficient evidence to convict defendant of shooting the victim where a codefendant testified against defendant and that testimony was substantially corroborated. Also, the trial court did not err in giving an accountability instruction where there was some evidence that defendant's companion, rather than defendant, shot the victim.

¶ 2   Following a jury trial, defendant, Alexander W. Mendez, was convicted of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) and sentenced to 22 years' imprisonment. He appeals, contending that he was not proved guilty beyond a reasonable doubt where the victim, D.S., was unable to positively identify defendant as the shooter, the only such

positive identification came from a codefendant who received leniency in exchange for his testimony, and other eyewitnesses described the shooter as black while the presentence investigation report in this case lists defendant's race as Hispanic. Defendant further contends that the trial court erred by instructing the jury on accountability where there was no evidence that defendant was involved in the crime as anything other than the principal, *i.e.*, the shooter. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     In October 2017, 13-year-old D.S. was shot near his home. Police eventually arrested defendant and charged him with aggravated battery with a firearm.

¶ 5     D.S. testified that on October 13, 2017, he was riding his bicycle to a football game. It was dark outside. As he rode through an alley near his home, he saw a group of at least five "boys." He recognized only Kewan Jackson, who had a "beef" with one of his brothers. Two of the other men, whom he described as Mexican or Hispanic, approached him. One man, wearing a red jacket, asked if he was a "Four," which D.S. believed referred to a gang. D.S. said that he was not. Nevertheless, the man drew a black and silver gun and shot him. All the men ran away.

¶ 6     Other people in the alley helped D.S. to his front porch. Paramedics arrived and took him to the hospital, where he underwent surgery. He was in the hospital for a month. He could not eat solid food for two weeks and did not return to school for several months. He needed a walker to "know how to walk again."

¶ 7     Officer Paul Sage responded to a report of the shooting. Several people flagged him down and pointed out D.S. Sage applied pressure to D.S.'s wound and accompanied D.S. to the hospital in an ambulance. D.S. told him that a light-skinned Hispanic male with curly hair and wearing a

red shirt had shot him. Officer Shazay Molleda, an evidence technician, processed the scene and recovered a shell casing in a parking lot adjacent to the alley.

¶ 8      Renika Melton witnessed the shooting and called 911 to report it. She reported that she could not identify the shooter but that he appeared to be a black man wearing a "red and orange" or "red and yellow" jacket. It was very dark in the alley and she could not see the faces of the men. She told Detective Joseph Richardt that the men who approached the victim were black. However, she reiterated that it was very dark and that "[i]n the dark everybody is going to look like they're black."

¶ 9      Detective Matthew Hasenbush talked to D.S. in the emergency room before his surgery. Although D.S. was conscious, he was hooked up to multiple machines and attended by various doctors and technicians. He appeared groggy and his speech was slow. D.S. said that he was approached by four black males, one of whom asked him about being a gang member. One of the males then pulled out a gun and shot him. D.S. testified that he could not remember speaking to Hasenbush on the night of the shooting.

¶ 10     Detective Matthew Thornton testified that he interviewed D.S. at the hospital on October 16, 2017, three days after the shooting. D.S. stated that he was shot by a stocky male in a red shirt. After speaking with D.S., Thornton picked up Jackson, who was interviewed by the Zion police.

¶ 11     Jackson testified that on October 13, 2013, he was with Xavier Aguire and defendant. They started drinking early in the day and thus Jackson's memories of the day were "jumbled up." At trial, he could not remember what defendant was wearing that day, but he acknowledged telling police after the shooting that defendant was wearing a red sweater, blue jeans, and blue and red shoes. He recalled telling the police that he saw a gun on " 'the older guy's hip,' " meaning

defendant's. Jackson had also testified earlier in juvenile court that defendant had a black and silver gun.

¶ 12    Jackson said that the group walked through an alley to get cigarettes. He did not recall defendant saying anything, but he acknowledged telling the police that defendant yelled, " 'What's up Four?,' " to D.S. Jackson testified that, after defendant asked D.S. if he was a four, Jackson turned around to look at something. As he was looking away, Jackson heard a gunshot and then ran away. Jackson denied that he shot the gun, and he did not think that Aguire shot it.

¶ 13    Jackson testified that, when he spoke with the police after the incident, he showed them photos from his cell phone. While he testified at trial that the photos were taken the day of the shooting or the day before, he testified in juvenile court that they were taken immediately before the shooting. The photos, which were extracted from his cell phone and admitted into evidence, show defendant with Jackson. Defendant is wearing a red sweatshirt with an "IU" logo and holding a gun. He has tattoos on the front of his neck that appear to extend to the bottom of his chin.

¶ 14    Jackson admitted that he was charged with aggravated battery with a firearm based on the October 13, 2017, shooting. As he was 17 at the time, the matter went to juvenile court. Jackson reached an agreement with the State whereby, in exchange for his testimony against defendant, the State would not seek to transfer Jackson to adult court and would not file charges against him in an unrelated child pornography incident.

¶ 15    Deputy Sheriff Thomas Sieber testified that he went to defendant's apartment to arrest him pursuant to a warrant. With the permission of defendant's wife, Sieber and another deputy searched the apartment. The apartment had two bedrooms, one of which appeared to be the adults' bedroom. In a closet in that bedroom, on a side containing male clothing, the deputies found a

blue cloth bag containing a red sweatshirt with an "IU" logo wrapped around a Tec-9 handgun. Forensic scientist Gary Lind opined that both the shell casing recovered from the crime scene and the bullet surgically removed from D.S. were fired from that gun.

¶ 16     Richardt testified that he was the lead detective on the case. He talked to D.S. shortly after his surgery. D.S. described his assailant as either Puerto Rican or white, of average build, with brown hair and a red sweatshirt. Richardt showed D.S. a photo array that included defendant's picture, but he did not identify anyone.

¶ 17     Richardt also interviewed Melton, who described seeing two "black or African American" men, one of whom was wearing a red sweatshirt with orange or yellow sleeves. Richardt interviewed Mario Cruz-Palmo, who described seeing three men, whom he believed were African American, arguing in an alley. Cruz-Palmo heard a gunshot and saw two people running away, but he did not see their faces and could not positively identify anyone.

¶ 18     Richardt also interviewed Jackson. Richardt was not aware of defendant before talking to Jackson. Jackson described the shooter as a Puerto Rican male with a stocky build and wearing a red sweater. Jackson said that Aguire was also at the scene. Jackson reported that the shooter's name was Alex, he was definitely an adult, and he had several distinctive tattoos on his face. Jackson believed him to be "some kind of either family or godfather or something" to Aguire.

¶ 19     Richardt and Jackson went through photos on Jackson's phone. Jackson said that the photos included defendant.

¶ 20     Over defendant's objection, the trial court instructed the jury on accountability. The jury found defendant guilty, and the trial court sentenced him to 22 years' imprisonment. Defendant timely appeals.

¶ 21                                    II. ANALYSIS

¶ 22    Defendant first contends that the evidence was insufficient to prove beyond a reasonable doubt that he was the shooter.  He argues as follows.  D.S. variously described the shooter as being white, black, and Hispanic, described him as having curly hair, failed to mention features such as defendant's distinctive tattoos, and failed to identify defendant in a photo array.  Other occurrence witnesses consistently described the shooter as black, whereas defendant is not.  The only witness to positively identify defendant as the shooter was Jackson, an accomplice who received lenient treatment in exchange for his testimony against defendant and who told inconsistent stories in his police interviews, juvenile court testimony, and testimony in this case.

¶ 23    In addressing a challenge to the evidence supporting a criminal conviction, we do not retry the defendant.  *People v. Smith*, 185 Ill. 2d 532, 541 (1999).  Rather, when "reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)  *People v. Bishop*, 218 Ill. 2d 232, 249 (2006) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).  A reviewing court will not reverse a conviction simply because the evidence is conflicting or the defendant claims that a witness is not credible.  *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 24    Here, defendant challenges the evidence identifying him as the shooter.  A single witness's identification is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting identification.  *People v. Slim*, 127 Ill. 2d 302, 307 (1989).  The witness need not describe the offender with complete accuracy, and discrepancies and omissions of detail only affect the credibility of the witnesses and the weight of their testimony.  *People v. Herrett*, 137 Ill. 2d 195, 205 (1990).

¶ 25    The evidence supports defendant's conviction. Jackson testified that he was with defendant and Aguire on the day of the shooting. As they walked through the alley, Jackson saw defendant and Aguire approach a boy on a bicycle and ask him about his gang membership.  Jackson told police that defendant then shot the boy.  D.S. testified that he was shot by a man wearing a red jacket or shirt.  Melton told police that two men approached the victim in an alley and a man wearing a red jacket shot the victim.  Jackson told police that defendant was wearing a red sweater. Also, photos on Jackson's phone show defendant wearing a red sweatshirt with an "IU" logo and holding a gun.  A gun similar to the one defendant displayed in the photos was found in his closet. It was wrapped in a red sweatshirt with an IU logo like the one he was wearing in the photos. Forensic analysis matched the gun to a shell casing found at the scene and to the bullet surgically removed from D.S.'s body.   From the testimony and the physical evidence, the jury could reasonably conclude that defendant was either the shooter or accountable for the shooter's actions. If the jury believed Jackson's trial testimony that he turned away and did not see who fired the shot, the jury could still conclude that the shooter was defendant given that he had the gun before the shooting and it was found in his closet afterward.   Alternatively, the jury could find that defendant gave the gun to Aguire, who shot D.S. and then returned the gun to defendant.  In that case, the jury could reasonably find defendant guilty by accountability.

¶ 26    Defendant contends, however, that the only witness to positively identify him was Jackson, who also was charged in the incident and received a favorable deal to testify against defendant. While it is true that accomplice testimony has inherent weaknesses and should be accepted only with "caution and suspicion," an accomplice's testimony, whether corroborated or uncorroborated, is sufficient if it convinces a jury of a defendant's guilt beyond a reasonable doubt.  *People v. Tenney*, 205 Ill. 2d 411, 429 (2002).  And although Jackson made a favorable deal to implicate

defendant, and his trial testimony varied somewhat from earlier versions, his testimony was corroborated to a significant extent. D.S. and Melton described the shooter as wearing a red jacket or shirt. Photos from Jackson's camera show defendant wearing a red IU sweatshirt and holding a gun. A gun similar to that seen in the photos was found in defendant's closet after the shooting, wrapped in a red IU sweatshirt. The gun matched a shell casing found at the scene and the bullet surgically extracted from D.S. Thus, in addition to Jackson's trial testimony, the corroborating evidence was strong.

¶ 27 Defendant further contends that the remaining occurrence witnesses described the shooter as black while defendant is Puerto Rican.[1] The jury was aware of this. However, given the totality of the evidence, it was reasonable for the jury to accord little weight to the mistake. Jackson told Richardt that the shooter was of Puerto Rican descent. In interviews, D.S. consistently described the shooter as a light-skinned Hispanic or possibly white. The only time D.S. described the shooter as black was when he was being prepared for surgery. Hasenbush testified that D.S. was hooked up to multiple machines and attended by various personnel. Under the circumstances, the jury could reasonably discount this identification, concluding that D.S. was somewhat impaired at that time.

¶ 28 Melton did describe the shooter as black. However, she emphasized that the alley was very dark and that she could not see the men's faces. She testified that, under those conditions, "everybody is going to look black." Cruz-Palmo likewise told Richardt that the shooter was black.

---

[1] As noted, defendant's presentence investigation report lists his race as simply "Hispanic." The jury was in the best position to view defendant and decide whether the alleged discrepancies in describing his race were significant.

However, he, too, did not see the shooter's face. Under these circumstances, the jury could reasonably disregard the alleged discrepancies.

¶ 29 Defendant points out that D.S. testified that he was approached by a group of "boys," but that defendant was 33 years old at the time of the incident. He further notes that D.S. said nothing about defendant's distinctive tattoos and that, at one point, D.S. described the shooter as having curly hair while in the photos defendant's hair is close-cropped. Generally, discrepancies in describing physical characteristics are not fatal, but simply affect the weight to be given the testimony. *People v. Holmes*, 141 Ill. 2d 204, 240 (1990). "[F]ew people are accurate judges of height, weight, and age." *People v. Dixon*, 133 Ill. App. 3d 1073, 1081 (1985). It is especially unreasonable to expect a victim in a stressful situation to notice such details, particularly at night under poor lighting conditions. *People v. Bias*, 131 Ill. App. 3d 98, 105 (1985).

¶ 30 Defendant cites *People v. Ash*, 102 Ill. 2d 485 (1984), but that case is distinguishable. There, the State called Phelps, a codefendant. Phelps initially refused to answer questions, invoking his fifth-amendment privilege until the State threatened to revoke his guilty plea. *Id.* at 491. Phelps then testified to the defendant's participation in a robbery. No other evidence unequivocally connected the defendant with the crime. Phelps admitted in his testimony that he was seeking dismissal of some of his charges, a lenient sentence, and assignment to a prison other than the one that housed the men against whom he had testified in a prior prosecution. *Id.* Phelps admitted that he " 'would do just about anything' " to avoid being incarcerated with those men. *Id.*

¶ 31 In contrast to Phelps' identification, Jackson's identification—though sufficient in itself to support defendant's conviction—was also substantially corroborated by the physical evidence. Thirteen-year-old D.S. was approached by an older male in a dark alley and shot. The stress of

the situation could reasonably account for any omissions and discrepancies in his description and his failure to identify defendant in a photo lineup. Neither of the other two occurrence witnesses saw the shooter's face, so their failure to accurately describe or identify defendant is not surprising. Under these circumstances, defendant was proved guilty beyond a reasonable doubt.

¶ 32    Defendant next contends that the trial court erred by instructing the jury on accountability. He argues that the evidence showed that he was either guilty as a principal or not at all.

¶ 33         "Instructions convey the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations toward a proper verdict. [Citation.] There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given. [Citation]. Instructions which are not supported by either the evidence or the law should not be given." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008).

The standard of review is whether the trial court abused its discretion. *Id.* at 66.

¶ 34    A person is guilty by accountability when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2016). "An instruction on the issue is justified if the State submits even the 'slightest' evidence to support a theory of accountability." *People v. Beltran*, 327 Ill. App. 3d 685, 692 (2002).

¶ 35    Here, as discussed in connection with defendant's first issue, Jackson testified at trial that defendant and Aguire approached the victim together. Jackson then turned away. He heard a shot but did not see who fired it. If the jury believed this testimony, it could conceivably have found that defendant gave the gun to Aguire, who fired the shot, and that defendant later regained the

gun. Defendant would thus be accountable for Aguire's actions. However unlikely this scenario, there was at least slight evidence on which jury could find defendant guilty by accountability.

¶ 36    *People v. Batchelor*, 202 Ill. App. 3d 316 (1990), is factually similar. There, witnesses saw three men—the defendant, Ricky Walls, and Tyrone Bufkin—walking together. The defendant had a gun. Witnesses heard shots and saw two men running away. Bufkin was found dead. The defendant told a friend he had shot a boy and gave the friend a gun. Bullets recovered from Bufkin's body matched the gun. The defendant testified that Walls fired the fatal shot. *Id.* at 320-21 Although most of the State's evidence at trial suggested that the defendant was the shooter, the appellate court held that the trial court properly instructed the jury on accountability. The court reasoned that at least some evidence supported a finding that the defendant gave the gun to Walls, who shot the victim. *Id.* at 331. Here, too, the jury could reasonably have found that defendant brought the gun to the scene then gave it to Aguire, who shot D.S.

¶ 37    In *People v. Williams*, 161 Ill. 2d 1 (1994), which defendant cites, the State's evidence showed that the defendant conspired with two women to kill a romantic rival. Moreover, all of the State's evidence showed that defendant was the shooter. *Id.* at 51. On appeal, the defendant challenged the giving of an accountability instruction. The State defended the instruction, but the supreme court held that the State's position confused the concepts of conspiracy and accountability. *Id.* Here, by contrast, there was at least slight evidence that Aguire pulled the trigger and that defendant was accountable for his actions.

¶ 38    In any event, any error in giving the accountability instruction was harmless. An alleged error is harmless if it is clear beyond a reasonable doubt that a rational jury would have convicted the defendant even absent the error. *People v. Thurow*, 203 Ill. 2d 352, 368-69 (2003) (citing *Neder v. United States*, 527 U.S. 1, 18 (1999)). In *Williams*, the court held that giving the

accountability instruction was erroneous yet harmless because there was no evidence supporting a theory of guilt where defendant was *not* the shooter; thus, it was clear beyond a reasonable doubt that the jury would have convicted the defendant even absent the instruction. *Williams*, 161 Ill. 2d at 51-52.

¶ 39    Here, despite defendant's argument to the contrary, the evidence that he was the shooter was strong. Defendant had the gun both before and after the shooting. Jackson testified that when defendant and Aguire approached the victim, Jackson looked away, heard shots, and then three all ran away. In previous statements, Jackson said that he saw defendant shoot the victim. Other occurrence witnesses described the shooter as wearing a red shirt like the one found in defendant's possession. It is clear beyond a reasonable doubt that the jury would have convicted defendant even absent the instruction.

¶ 40                                    III. CONCLUSION

¶ 41    The judgment of the circuit court of Lake County is affirmed.

¶ 42    Affirmed.