NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170756-U

NO. 4-17-0756

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JOSHU'AH K. YOUNG, | ) | No. 17CF51 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Heidi N. Ladd, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) the State proved defendant guilty of first degree murder beyond a reasonable doubt, (2) counsel did not provide deficient performance by failing to call an expert witness, (3) the trial court did not err in finding no *Brady* violation, (4) the trial court did not err in admonishing jurors under Rule 431(b), and (5) defendant's 40-year sentence was not an abuse of discretion.

¶ 2    In November 2016, the State charged defendant, Joshu'ah K. Young, with three counts of first degree murder. In July 2017, a jury convicted defendant of first degree murder. In September 2017, the trial court sentenced defendant to 40 years' imprisonment and a 3-year term of mandatory supervised release.

¶ 3    Defendant appeals, arguing (1) a witness's identification of defendant was unreliable and did not prove his guilt beyond a reasonable doubt; (2) trial counsel provided ineffective assistance of counsel where the defense strategy was to challenge the witness's

identification but trial counsel failed to call an expert witness to support the defense; (3) the trial court erred in finding that, although the State failed to tender discoverable material to the defense, there was no *Brady* violation because the letter was not material; (4) the court erred in admonishing the potential jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); and (5) defendant received a *de facto* life sentence without the court finding he was permanently incorrigible for an offense that occurred when he was a juvenile, in violation of the eighth amendment. For the following reasons, we affirm the trial court's judgment.

¶ 4                                I. BACKGROUND

¶ 5        In November 2016, the State charged defendant with three counts of first degree murder for the shooting death of Rakim Vineyard. In February 2017, the State filed amended charges, adding that there was "excluded jurisdiction" pursuant to section 5-130 of the Juvenile Court Act of 1987 (705 ILCS 405/5-130(1)(a) (West 2016)) ("The definition of delinquent minor under Section 5-120 of this Article shall not apply to any minor who at the time of the offense was at least 16 years of age and who is charged with: (i) first degree murder ***."). The State also brought a fourth count of first degree murder.

¶ 6                                A. *Voir Dire*

¶ 7        In July 2014, the matter proceeded to trial. During jury selection, the trial court read all Rule 431(b) principles in one list to the prospective jurors by articulating the following statements. "The Defendant is presumed innocent of the charge against him. Before a Defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. The Defendant is not required to offer any evidence on his own behalf. And, if a Defendant does not testify, it cannot be held against him." The court then asked each juror, "[D]o you understand and accept each of those principles?"

- 2 -

¶ 8                                    B. Trial

¶ 9            During the trial, the jury heard the following evidence relevant to this appeal.

¶ 10                              1. *Bruce Ramseyer*

¶ 11           Bruce Ramseyer testified he was on duty with the Champaign Police Department on July 19, 2014, and responded to a report of shots fired at approximately 12:30 p.m. According to Ramseyer, a male in his twenties was found on the sidewalk by 1010 North Sixth Street with obvious injuries. Ramseyer identified People's exhibit No. 2 as a satellite image of the area where the shooting occurred that showed the house at 1007 North Sixth Street was immediately to the south of 1011 North Sixth Street.

¶ 12                              2. *Russell Beck*

¶ 13           Russell Beck, a Champaign police officer, testified that, on July 19, 2014, he was called to assist with the crime scene. At the time, Beck had the opportunity to walk around the scene and note the location of driveways, streets, and houses. In February 2017, Beck returned to the scene, where the layout of the driveways, sidewalks, houses, and streets appeared to be the same as it was the day of the shooting. In February 2017, Beck photographed the scene from the perspective of 1007 North Sixth Street. Beck took photographs from the porch of 1007 North Sixth Street showing a clear view of the street and sidewalks to the north of the house.

¶ 14                              3. *Enjole Bowens*

¶ 15           Enjole Bowens testified that in July 2014, she lived in a blue house at 1007 North Sixth Street. On July 19, 2014, at approximately 12:23 p.m., Bowens had just sent her children inside for lunch and she sat on her front porch waiting for her mother. According to Bowens, she saw a man walking down the street with "a big old gun." Bowens testified, "I didn't think it was real because I'm like, ain't know nobody walking down the street with no gun like this." The

man walked past Bowens and stopped at her neighbor's driveway. Bowens stated, "Rakim was standing across the street, and he was talking to some other guys that were at another house on the corner. And, [defendant] got to my neighbor[']s driveway and he was, like, 'you a b*** a*** n***,' and just started shooting." According to Bowens, defendant was right by her, but he did not see her.

¶ 16        Bowens testified defendant "emptied the clip," turned, and went back down the street toward Douglas Park in a fast walk. Once defendant was out of sight, Bowens went to the victim and tried to help him. Bowens stated, "The guys that [the victim] was talking to at the house came over to me and was, like, [']don't call the police, he dead.['] " Bowens called 911 and stayed with the victim until police arrived. Bowens testified she stayed on her porch while officers taped off and photographed the crime scene. Bowens pointed out her blue house in photographs of the crime scene and pointed out where she could see herself sitting on the porch in the photographs. According to Bowens, she had a clear view of what happened. The victim did not "pull out anything."

¶ 17        Bowens testified she had seen defendant before. According to Bowens, she visited her younger brother a few times when he lived in Prairie Green. When Bowens visited her brother, she saw "all the boys around there hanging out." Defendant was one of those persons. Bowens testified defendant's lips and nose were distinctive features, and defendant had "perfect lips." Bowens was confident defendant was the person she saw shoot Vineyard. According to Bowens, defendant wore a white button up shirt with blue on the sleeve and dark color jean shorts on the day of the shooting. Bowens testified defendant had a low hightop fade hairstyle.

¶ 18            On the day of the shooting, Bowens told officers defendant was in his early 20s but might be older.  Bowens acknowledged she did not tell police she was familiar with the shooter during her conversations with officers that day.  Bowens testified, "I was not familiar with him, like, I didn't know him.  Like, I said, we live in Champaign.  Champaign is a small town, so you see everybody.  So, I didn't know him.  I didn't know his name, nothing."  Bowens stated she did not know at the time that she had seen defendant before.  Approximately one month after the shooting, Bowens spoke with Detective Patrick Kelly and described the perpetrator as "young."  Bowens did not inform Kelly that defendant was someone she had seen before because, at that time, she did not know that she had seen him before.  Bowens testified she did not remember telling another detective that she was unsure if she could identify the suspect.  Bowens was not shown a photo line-up of suspects.

¶ 19            Bowens met with Kelly a second time in 2016.  During the second meeting, Bowens told Kelly defendant was someone she had seen before but she did not know his name.  Bowens described the shooter as "a young, light skinned guy," which was the "[s]ame description [she] gave the day that it happened."  Bowens testified, "I did talk about his lips because that was, like, one of the features that I really remembered, yes.  It was his lips."  Bowens testified she had previously seen defendant around town in Urbana and Prairie Green before the shooting.  According to Bowens, she also told Kelly that she saw defendant on Facebook after the shooting.

¶ 20            Bowens met with Kelly a third time in 2017.  Bowens did not know if the third meeting took place after defendant had been arrested.  According to Bowens, Kelly brought up defendant's name during the third meeting.  Bowens had a conversation with Detective Jeremiah Christian in January 2017.  Defense counsel asked Bowens if she referred to a conversation she

had with someone about the summer of 2014 where she stated, "I don't know Josh." Bowens responded, "I don't know, but I don't know him. I'm not friends with him. I don't know Josh." Bowens testified that to "know" someone "you have talk[ed] to them, *** worked with the person, been around this person." According to Bowens, "knowing" someone was different from having seen someone but not having talked to the person. Bowens testified she was 100% positive defendant was the person she saw shoot Vineyard. Bowens acknowledged defendant was facing away from her while he fired the gun, but she testified she was focused on defendant as he walked away past her house because she did not know if defendant saw her sitting on her porch. Bowens shifted her attention to the victim once defendant left.

¶ 21                                      4. *Patrick Kelly*

¶ 22          Detective Patrick Kelly testified he investigated the shooting death of Vineyard. Kelly attended Vineyard's autopsy where two projectiles were removed from the victim's body. Kelly sent four spent bullets and eight Federal .40-caliber shell casings for testing at the Illinois State Police Forensic Science Laboratory. According to Kelly, the spent bullets and shell casings were tested to determine whether they were fired from the same weapon based on identifiable striations. Kelly did not have the bullets and casings tested for fingerprints or DNA. Kelly testified DNA testing was not requested because the high heat generated from firing the weapon destroyed any DNA on the bullets and the projectiles recovered from the victim would only have the victim's DNA.

¶ 23                                      5. *Shiping Bao*

¶ 24          Dr. Shiping Bao, an independent forensic pathologist, conducted the autopsy on Vineyard's body. Dr. Bao testified Vineyard was shot five times and one bullet perforated his aorta. According to Dr. Bao, the perforation of the aorta was a fatal wound. Dr. Bao recovered

the bullet "under the skin of the left lateral epi." Dr. Bao testified there was no stippling or soot on the victim's body so Dr. Bao could not determine how far away the shooter was.

¶ 25                                        6. *Jonte Powell*

¶ 26            Jonte Powell testified his cousin was best friends with defendant. Powell acknowledged he was currently serving a prison sentence for unlawful possession with intent to deliver a controlled substance in Champaign County case No. 14-CF-1035. Powell also had a prior conviction for unlawful possession with intent to deliver a controlled substance in Champaign County case No. 13-CF-638. Powell signed an agreement with the State Attorney's office where Powell promised to tell the truth about the events of the day of the shooting and, in exchange, the State would not file any criminal charges against him regarding his involvement or knowledge of the death of Vineyard.

¶ 27            On the day of the shooting, Powell was at his home with defendant, Paradise Williams, and two females when he received a call from someone who wanted heroin. According to Powell, defendant asked if he could go with Powell and the two females asked Powell to drop them off at their house. Powell testified, "But when we got in the car, [defendant] got in on the passenger side and we went to drop the females, we went to drop the females off. *** And after that, I went to go drop the dope off, and as I'm dropping the dope off, [defendant] was, like, [']man, let me see your phone,['] he started texting somebody." According to Powell, defendant then told Powell to "pull up at Shamario['s] crib." Defendant went into Shamario's house and the two men returned to the car. Defendant asked Powell to take him to Sixth Street "to make a hit," which Powell understood to mean a drug transaction.

¶ 28            Powell parked his car on Eureka Street, just west of Sixth Street and facing toward Fifth Street. Defendant exited the vehicle and began walking down Sixth Street. Powell

testified he could not see defendant after he turned the corner and walked down Sixth Street. Approximately four or five minutes later, defendant knocked on the passenger door. Powell testified, "I opened the door, and he, like—he like, [']go, go, go, go, they shooting.['] And then I'm like, I tell him, [']like man, what's going on.['] He like, [']they got to blowing at me so I got to blowing back.['] " Powell testified defendant had a black automatic firearm with him when he returned to the vehicle. According to Powell, he took back streets at Shamario's suggestion and Shamario asked to be dropped off at an auction his father was attending. Before Shamario left the vehicle, he asked defendant to give him the gun. Shamario took the black automatic from defendant and left. According to Powell, defendant lived right next door to Powell, so Powell drove home.

¶ 29    When they returned home, defendant went to his house and Powell and Paradise went to Powell's house. Approximately half an hour later, Powell learned that Vineyard had been shot and killed. Powell testified,

"I went, I—as soon as I found out, I went next door, and I—I tell [defendant], I'm like, [']man, I hope you ain't shoot Rakim, bro,['] he—man, he like, [']bro, they got to blowing at me so I got to blowing back.['] *** I say, man, bro, I'm like, [']I ain't going down for nobody murder, bro.['] He's like *** [']man, calm down. If them people come get us, bro, I'm going to take my weight,['] and he was, like, [']let me find out the mother f****r telling, you next,['] and I just left it at that."

- 8 -

Powell testified he had not spoken to defendant since the incident. Powell identified his vehicle, a gold "2000 Crown Vic," in surveillance videos showing his vehicle traveling on Fifth Street and Eureka Street between 12:19 p.m. and 12:23 p.m. on the day of the shooting.

¶ 30 One video shows a gold car traveling north on Fifth Street. The second video shows a similar car traveling east on Eureka Street. The vehicle stops, a figure walks away from the car, and the car turns around to face the other way. A short time later, a figure runs toward the car and the car drives toward Fifth Street. The surveillance footage then showed a gold car traveling south on Fifth Street.

¶ 31 Powell denied having a conversation with Shaundrell Brown about the shooting. Powell acknowledged the surveillance video did not depict anything unique to his car, but Powell stated he knew what happened that day and knew it was his car. Powell testified police officers attempted to speak with him about the shooting on multiple occasions but Powell invoked his right to an attorney. In November 2016, police officers visited Powell at the Big Muddy Correctional Center and offered Powell immunity for his involvement on the day in question. The agreement required Powell to provide truthful testimony. Powell testified he did not speak with police earlier because of the threat defendant made when Powell confronted him about Vineyard's murder on the day in question.

¶ 32                     7. *Nathan Mixon*

¶ 33 Nathan Mixon testified he previously lived in Champaign County and came to know defendant. Mixon was currently in the custody of the Illinois Department of Corrections. Mixon acknowledged the following criminal convictions: residential burglary in Champaign County case No. 16-CF-1399, obstructing justice in La Salle County case No. 13-CF-242, and burglary in Champaign County case No. 10-CF-552. On the day of the shooting, Mixon was in

Chicago but subsequently had a conversation that caused him to gain some knowledge about the shooting. In April 2017, Mixon was presented with a cooperation agreement that stated the State would not charge Mixon for his involvement in or knowledge of the death of Vineyard or for his involvement in an unrelated residential burglary in exchange for Mixon's truthful statement regarding the shooting.

¶ 34 In February 2015, Mixon had a face-to-face interaction with defendant in his room they used to record rap sessions. Prior to the February 2015 conversation, defendant's house had been shot up. Mixon asked defendant why someone was shooting at his house. According to Mixon, defendant "said that they shooting at the house because he shot up Rakim."

¶ 35 8. *Kemion Dorris*

¶ 36 Kemion Dorris testified he was currently imprisoned for a burglary conviction in Champaign County case No. 16-CF-226. Dorris was previously adjudicated a delinquent minor for the offense of criminal damage to property in Champaign County case No. 14-JD-213 and for the offense of robbery in Champaign County case No. 13-JD-123. In 2015, Dorris was incarcerated in the Harrisburg Juvenile Department of Corrections with defendant. Dorris testified he spoke with defendant about Vineyard's death. Defendant told Dorris he pulled up with Powell and saw Vineyard on a porch. According to Dorris, defendant said he called Vineyard by name and defendant "emptied his clip" on Vineyard. Dorris was not promised anything in exchange for his testimony. Dorris testified Courian Atkins was present during his conversation with defendant.

¶ 37 9. *Courian Atkins*

¶ 38 Courian Atkins testified he was currently incarcerated following his conviction of possession of a firearm by a gang member. Atkins stated he was at the Harrisburg Youth

Correctional facility at the same time as Dorris and defendant. According to Atkins, he was never in the presence of defendant and Dorris at the same time. Atkins testified he never heard defendant say he killed Vineyard.

¶ 39                                    10. *Shaundrell Brown*

¶ 40          Shaundrell Brown testified he was adjudicated a delinquent in 2010 for criminal damage to property and in 2011 for aggravated battery. Brown testified he was also convicted of possession of a controlled substance in 2013 and 2014, and he was recently convicted of possession of a controlled substance and was awaiting sentencing. Brown testified Powell was his cousin and best friend and the two were held in the Champaign County jail at the same time in 2014. According to Brown, he had a conversation with Powell about Vineyard's murder where Powell made the following statements: (1) "I'm not about to go to jail over what happened," (2) "if n*** come at me, I'm going to say that [defendant] did it," (3) "[defendant] owes me money for heroin," and (4) "I don't give no f*** if [defendant] didn't do it, f*** him."

¶ 41          Brown testified he had multiple convictions for unlawful possession of a controlled substance. In 2013 and 2014, Brown occasionally used heroin and he was currently awaiting sentencing on a case involving heroin. Brown testified that, during the previous five years, he had periods where he did not use heroin, but when he did use heroin, he "use[d] it sometimes every day."

¶ 42                                    11. *Verdict*

¶ 43          Following closing arguments and jury instructions, the jury reached a verdict. The jury found defendant guilty of first degree murder. The jury further found the allegation that defendant personally discharged a firearm that caused death to another person was proven.

¶ 44                                    C. Posttrial Motion

¶ 45        In August 2017, defense counsel filed a motion for acquittal or in the alternative a

motion for a new trial.  In part, the motion alleged defendant was denied a fair trial because the

State was in possession of exculpatory evidence that it failed to disclose to the defense.  The

evidence the State allegedly withheld was a letter from Takario Green, a defendant in an

unrelated murder case.  In the letter, Green recounted a conversation he had with Oshea Cotton

in Georgia.  During the conversation, "Cotton t[old] Takario Green that he, Cotton, fled to

Georgia from Champaign because ' "KO" killed a guy named Rakim, his name Rockie.' " "KO"

was the street name of Anthony Fowler, an individual who "was described by witnesses as

someone who had had a physical confrontation with victim Rakim Vineyard at the High Drive

Club in Champaign, in the time period leading up to Rakim Vineyard's murder."

¶ 46        Following a hearing on the posttrial motion, the trial court noted the State

conceded the letter was within its possession and it should have been disclosed to the defense.

The court further noted "that it was an inadvertent violation of the *Brady* material requirements,

but it was a violation not to turn that over."  The court then considered whether the letter was

material and stated as follows:

>            "The description of that letter is someone else confessing to
>
> a murder, is certainly overstated.  What was contained in that letter
>
> was one sentence, in several pages, that referred the fact that
>
> O'Shay Cotton had told Green, the author of the letter, that O'Shay
>
> Cotton had moved to Georgia because someone identified as KO
>
> killed a guy name[d] Rakeem, R-a-k-e-e-m, dash, his name,
>
> Rakim, R-a-k-i-m.  That was the extent of the material that was not
>
> turned over that's relevant to this analysis and relevant to this case.

- 12 -

It's hardly a confession. It's certainly a suggestion or implication that there was hearsay from Mr. Cotton as to his theory, beliefs, speculation or repeating other hearsay, that someone named KO had killed a guy name[d] Rakim. There was then—has been certainly evidence that KO is a nickname for Anthony Fowler, and I don't believe that's being disputed.

The [d]efendant has not demonstrated how not having that information prejudiced him in any way. We had multiple pretrial motions that demonstrated multiple people in the community were making statements and discussing the shootings, and speculating, theorizing or engaging in conversations about who may have been responsible for those shootings. There's nothing in this letter that's other than speculation predicated on hearsay that then was communicated to Mr. Green."

The court further found defendant failed to demonstrate a reasonable probability that the outcome of the trial would have been different or that the guilty verdict would be undermined or questioned as to its soundness. The court also noted the lack of testimony to suggest that Cotton could testify to anything other than his opinion, speculation, and hearsay or that Fowler admitted to anything or made any incriminating statements.

¶ 47 The trial court further noted Cotton was made available to both parties as a witness and named as a witness by the State. The State tendered a statement from Cotton identifying defendant as the shooter. The court finally found that "any suggestion that this may have been useful as impeachment evidence for Mr. Cotton is now eviscerated by the fact he was

never called as a witness." The court concluded that although there was a technical discovery violation, it had no import on the outcome of the proceedings.

¶ 48                                              D. Sentencing

¶ 49          Prior to sentencing, defense counsel asked the trial court to take judicial notice of defendant's juvenile cases. These files showed defendant was committed to juvenile detention numerous times in Champaign County case Nos. 11-JD-168, 12-JD-174, 12-JD-225, 13-JD-106, 14-JD-137, 15-JD-46, and 15-JD-138. When defendant was 13 years old, he was diagnosed with several mental health and behavioral issues, including a mood disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, and a past diagnosis of posttraumatic stress disorder.

¶ 50          At the sentencing hearing, the State called Detective Dustin Sumption, who testified that as part of the investigation into the shooting, he discovered a bullet from the shooting entered a home and grazed a 14-year-old boy's thigh. Ryan Snyder, the Lieutenant of Operations for the Champaign County Sheriff's Office, testified about several disciplinary incidents while defendant was in the Champaign County correctional center. The disciplinary incidents included yelling at a correctional officer, engaging in a verbal argument with another inmate and throwing suspected urine at the inmate, and flooding his cell. The incidents also include several instances where defendant "refused housing."

¶ 51          Matthew McCallister, a correctional officer with the Champaign County Sheriff's Office, testified that after the verdict was issued, defendant turned to the victim's family "and stuck both middle fingers up." According to McCallister, defendant also mouthed "f*** you" toward the victim's family. Detective Christian testified about a telephone call defendant made after he was convicted, and the State admitted the recording into evidence. According to

Detective Christian, he found the call noteworthy for the following reasons: "There was a portion of the conversation where [defendant] started talking about his possibility of an appeal process. Then he continued on and mentioned, he can come back, the person he referred to as 'dude' could not come back because he was in the dirt." The victim's grandmother read a victim impact statement.

¶ 52          The trial court stated it considered the presentence investigation report, the evidence at trial and at sentencing, and the relevant statutory factors, "including but not limited to, the nature and circumstances of the offense, the evidence and applicable factors in aggravation and mitigation, the character, history and rehabilitative potential of the [d]efendant, and the arguments and recommendations of counsel." The court noted defendant was 16 years and 10 months old when he committed the offense. Although defendant refused to fill out a social history form or be interviewed about any topic, the court carefully reviewed the juvenile files and found defendant grew up with his mother and three siblings. Defendant was not close with his father, who appeared to be "the victim of one of the violent assaults as referred to in some of the reports in the juvenile matters."

¶ 53          The trial court noted defendant was detained 11 times as a juvenile, putting him "on notice that the choices he was making and the conduct he was choosing to engage in and repeat were taking his life down the wrong path." Defendant generally behaved while in the juvenile detention center, indicating he could understand and follow the rules when it served his purpose. The court further considered defendant's mental health and substance abuse issues. Defendant was adjudicated a delinquent minor three times and provided with multiple services, including counseling and substance-abuse treatment. The court stated as follows: "[Defendant] does present a history of two and a half years of involvement with the Juvenile Justice system.

- 15 -

Multiple cases. Multiple opportunities to deal with his problems. Supportive services. People who were trying to assist him in re-directing his life. He did not utilize those opportunities, over and over."

¶ 54 The trial court specifically noted it must consider special sentencing factors because defendant was a juvenile at the time of the offense, including the diminished culpability and greater prospects for reform that young people offer. The court noted it was "prohibited from imposing *de facto* life sentences defined as sentences of such a length that the [d]efendant has no reasonable expectation of parole." The court stated as follows:

"I wanted to make it clear this [c]ourt has evaluated all of those factors, giving them careful consideration, as I must, including the [d]efendant's life, his history, his family life, and I— as much as that is available to this [c]ourt. I've considered his diminished capacity. I've considered the fact he was sixteen years, ten months old. I have considered the fact that minors are immature, can be irresponsible, reckless, impulsive and vulnerable to negative influences. And as the [c]ourts have observed, can lack control over their environment."

The court discussed case law regarding what constituted a *de facto* life sentence for a minor, including cases that drew a bright line and cases that instead determined that all the factors must be weighed. The court determined it must be mindful of all the factors and give each due consideration. The court addressed the factors at great length and in great detail, and the court determined the appropriate sentence was 40 years' imprisonment followed by a 3-year term of mandatory supervised release (MSR). This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56            On appeal, defendant argues (1) Bowens's identification of defendant was

unreliable and did not prove his guilt beyond a reasonable doubt; (2) trial counsel provided

ineffective assistance of counsel where the defense strategy was to challenge the witness's

identification but trial counsel failed to call an expert witness to support the defense; (3) the trial

court erred in finding that, although the State failed to tender discoverable material to the

defense, there was no *Brady* violation because the letter was not material; (4) the court erred in

admonishing the potential jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012);

and (5) defendant received a *de facto* life sentence without the court finding that he was

permanently incorrigible for an offense that occurred when he was a juvenile, in violation of the

eighth amendment.  We turn first to Bowens's identification of defendant.

¶ 57                          A. Sufficiency of the Evidence

¶ 58            Defendant first argues Bowens's identification of him was unreliable and did not

prove his guilt beyond a reasonable doubt.

¶ 59            A defendant may only be convicted upon proof beyond a reasonable doubt of

every fact necessary to constitute the crime with which he or she is charged.  *In re Winship*, 397

U.S. 358, 364 (1970).  In determining the sufficiency of the evidence supporting a conviction, we

do not retry the defendant.  *People v. Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217

(2006).  Instead, we must resolve " 'whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.' "  (Emphasis in original.)  *People v. Collins*, 106 Ill. 2d

237, 261, 478 N.E.2d 267, 277 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We allow all reasonable inferences in the light most favorable to the State.  *People v.*

*Beauchamp*, 241 Ill. 2d 1, 8, 944 N.E.2d 319, 323 (2011). We reverse only where the evidence is so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004).

¶ 60     "A positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction." *People v. Piatkowski*, 225 Ill. 2d 551, 566, 870 N.E.2d 403, 411 (2007). It is the province of the finder of fact to determine the credibility of a witness and the finding is entitled to great weight. *People v. Smith*, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999). Although the trier of fact is afforded great deference, a jury's determination of the evidence is not binding or conclusive. *People v. Cunningham*, 212 Ill. 2d 274, 280, 818 N.E.2d 304, 308 (2004). "[W]here the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* at 279. Eyewitness testimony may be found insufficient, "but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Id.* at 280.

¶ 61     "To determine the reliability of eyewitness identifications, we look to the totality of the circumstances and consider five factors: (1) the witness's opportunity to observe the offender at the scene, (2) the witness's level of attention at the time of the crime, (3) the accuracy of prior descriptions, (4) the witness's level of certainty at the identification confrontation, and (5) the time between the crime and confrontation." *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 59, 145 N.E.3d 623. Illinois courts apply an additional sixth factor: acquaintance with the offender before the crime. *Id.*

¶ 62     In this case, the jury was instructed to consider the first five factors outlined above. These factors, taken as a whole, support the reliability of Bowens's identification of

defendant. Bowens observed the shooting from her front porch during the daytime. She had a clear and unobstructed view of the sidewalk and her neighbor's driveway, as shown in the photographs taken from her porch. Bowens's attention was drawn by the fact that defendant carried a large gun in his hand. Although Bowens thought the gun was fake at first, she testified her attention was focused on defendant throughout the shooting.

¶ 63    At trial, Bowens testified defendant's lips and nose were distinctive features, and defendant had "perfect lips." Bowens was confident that defendant was the person she saw shoot Vineyard. According to Bowens, defendant wore a white button up shirt with blue on the sleeve and dark color jean shorts on the day of the shooting. Bowens testified defendant had a low hightop fade hairstyle. The day of the shooting, Bowens described the shooter to a police officer "as a black male with light skin tone, approximately 5'9", skinny, white shirt with a blue stripe going down the side, dark denim jean shorts and a box style fade haircut." The description given on the day of the shooting supports both that Bowens had ample opportunity to observe the shooter and her high level of attention.

¶ 64    Defendant argues Bowens's identification of defendant is unreliable because her description was too generic. Bowens's description was more specific than descriptions deemed "generic." *People v. Simmons*, 2016 IL App (1st) 131300, ¶¶ 49, 95, 66 N.E.3d 360 (finding "a male black," "a male black with a clean look, clean hair," and "a female black [with] long hair" generic descriptions). Bowens described the shooter as more than "a male black." Bowens described the shooter's height, body type, clothing, and hairstyle. Although Bowens provided additional details during her testimony, such as describing defendant's lips, than she did in prior descriptions of defendant, that sort of arguable inconsistency is a matter for the trier of fact to sort out and defense counsel questioned Bowens extensively as to these arguable inconsistencies.

"The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *Sutherland*, 223 Ill. 2d at 242.

¶ 65    As to the fourth factor, Bowens testified she was 100% certain defendant was the shooter and had confidence in her identification. Defendant does not argue this factor weighs against the State. Accordingly, we find Bowens's confidence in her identification supports the reliability of her testimony.

¶ 66    Finally, defendant argues Bowens failed to identify defendant until two years after the shooting and only after she saw his picture on Facebook and in newspapers despite a prior acquaintance with him. The length of time between the crime and Bowens's identification of defendant does not necessarily weigh against the reliability of her identification. "The lapse of time goes only to the weight of the testimony, a question for the jury, and does not destroy the witness's credibility." *People v. Rodgers*, 53 Ill. 2d 207, 214, 290 N.E.2d 251, 255 (1972) (finding a two year lapse of time before identification did not render the identification unreliable). Additionally, Bowens testified she recognized the shooter's face in a photograph on Facebook and later realized she had seen him before. Defendant argues this renders her identification unreliable. However, defense counsel rigorously cross-examined Bowens on this point and the resolution of any conflicts or inconsistencies in her testimony was a matter for the jury. *Sutherland*, 223 Ill. 2d at 242.

¶ 67    Even if Bowens's identification was unreliable, there is sufficient evidence to support a conviction. Powell testified defendant was in his car the day of the shooting and asked him to stop the car less than a block from where the shooting occurred. According to Powell, defendant exited the vehicle and walked up the block of Sixth Street where the shooting

occurred. Defendant returned a short time later, holding a black firearm and telling Powell to "go, go, go, go" because of the shooting. Powell testified defendant told him "they got to blowing at me so I got to blowing back." And when Powell learned of Vineyard's death and confronted defendant, defendant again said they got to "blowing" at him, so he had to "blow" back. Powell's testimony was partially corroborated by the surveillance video showing his gold vehicle in the vicinity of the shooting. Moreover, Mixon and Dorris also testified that defendant admitted to shooting Vineyard.

¶ 68        Defendant argues this additional evidence of defendant's guilt was impeached. However, the jury was fully apprised of the witnesses' prior convictions and of Powell's and Mixon's immunity agreements with the State. The jury also heard Atkins's testimony that conflicted with Dorris's testimony. *People v. Wheeler*, 401 Ill. App. 3d 304, 312, 929 N.E.2d 99, 106 (2010) ("The jury was aware of all of the evidence used to impeach the witnesses, and it was its duty to assess the witnesses' credibility in light of those impeaching factors."). The evidence, even without Bowens' testimony was not so unreasonable, improbable, or unsatisfactory as to justify reversal of the jury's determination that defendant is guilty beyond a reasonable doubt. *Id.*

¶ 69                    B. Ineffective Assistance of Counsel

¶ 70        Defendant next asserts his trial counsel provided ineffective assistance of counsel where the defense strategy was to challenge Bowens's identification, but trial counsel failed to call an expert witness to support the defense. The State contends counsel's performance was not deficient.

¶ 71        A claim of ineffective assistance of counsel is governed by the familiar framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of

- 21 -

ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767. The deficient-performance prong requires a defendant to show that counsel's performance was objectively unreasonable under prevailing professional norms. *People v. Veach*, 2017 IL 120649, ¶ 30, 89 N.E.3d 366. The prejudice prong requires a showing that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Id.* A defendant must satisfy both prongs to prevail on a claim of ineffective assistance of counsel. *Id.* We review a claim of ineffective assistance of counsel under a bifurcated standard of review. *People v. Nowicki*, 385 Ill. App. 3d 53, 81, 894 N.E.2d 896, 897 (2008). We defer to the trier of fact unless the findings of fact are against the manifest weight of the evidence, but we review the ultimate legal conclusion of whether counsel's actions support a claim of ineffective assistance *de novo*. *Id.*

¶ 72        Illinois courts "have previously held that defense counsel's decision to call or not to call witnesses is presumed to be a tactical choice which will not support an ineffectiveness claim." *Id.* at 84. Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432, 719 N.E.2d 664, 673 (1999). "Moreover, a mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective." *People v. Peterson*, 2017 IL 120331, ¶ 80, 106 N.E.3d 944. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *People v. Perry*, 224 Ill. 2d 312, 355-56, 864 N.E.2d 196, 222 (2007).

¶ 73        Here, defense counsel's trial strategy was not so unsound that he failed to conduct meaningful testing of the State's case. Nor was his strategy so irrational that no reasonably

- 22 -

effective counsel in similar circumstances would use that strategy. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 36, 125 N.E.3d 1246. Counsel might have decided against calling an expert witness because the State would have called its own expert witness to bolster the accuracy of the eyewitness identification. *People v. Hamilton*, 361 Ill. App. 3d 836, 847, 838 N.E.2d 160, 170 (2005) ("Counsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger, because the State could always call its own witness to offer a contrasting opinion.").

¶ 74        Moreover, in resolving issues related to counsel's performance, reviewing courts must consider the totality of counsel's conduct, not just an isolated incident. *Id.* Here, defense counsel rigorously cross-examined all the witnesses, called a number of witnesses to impeach Bowens's testimony, and thoroughly argued the issue of identification. Defense counsel argued the factors the jury was to consider when evaluating identification testimony and called into question Bowens's certainty.

¶ 75        Defendant relies on *People v. Lerma*, 2016 IL 118496, 47 N.E.3d 985. In *Lerma*, the Illinois Supreme Court found a trial court abused its discretion in excluding a defense expert witness on the reliability of eyewitness identification. *Id.* ¶ 26. In that case, the only evidence against the defendant was identification by two eyewitnesses, one of whom did not testify and, thus, was not subject to cross-examination. *Id.* The supreme court acknowledged "expert eyewitness testimony is both relevant and appropriate." *Id.* The supreme court found an abuse of discretion where the trial court denied the defendant's request to present relevant and probative testimony from an expert witness. *Id.* ¶ 32.

¶ 76        Although the supreme court acknowledged that expert testimony on the reliability

of eyewitness identification was "relevant and appropriate," we find defendant's reliance on

*Lerma* misplaced.

> "[T]he issue in *Lerma*—whether the trial court abused its
>
> discretion in rejecting proffered expert testimony—is manifestly
>
> different than the issue presented here, *i.e.*, whether defense
>
> counsel's performance fell below an objectively reasonable
>
> standard based on the failure to call an expert witness at trial.  The
>
> finding that 'research concerning eyewitness identification[ ] ***
>
> is well settled, well supported, and in appropriate cases a perfectly
>
> proper subject for expert testimony' [citation] does not, standing
>
> alone, support the conclusion that trial counsel here was *per se*
>
> ineffective for not presenting such expert testimony or that expert
>
> testimony is required in every case."  *Macklin*, 2019 IL App (1st)
>
> 161165, ¶ 39.

The *Macklin* court went on to explain that counsel may well choose not to call an expert witness

to avoid "a counterdesignation by the State, which would highlight and bolster the accuracy of

the eyewitness identification."  *Id.*

¶ 77        Here, counsel rigorously cross-examined Bowens, presented impeachment

evidence, and zealously argued the reliability of Bowens's identification, refuting the argument

that defense counsel failed to conduct meaningful adversarial testing of the State's case.  As

such, we conclude defendant has failed to demonstrate that counsel's decision not to call an

expert witness—a matter of trial strategy—constituted deficient representation.

¶ 78                              C. Discovery Violation

¶ 79          Next, defendant argues the trial court erred in finding that, although the State failed to tender discoverable material to the defense, there was no violation of *Brady v. Maryland*, 373 U.S. 83 (1963), because the letter was not material.

¶ 80          "A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74, 890 N.E.2d 500, 510 (2008).  Evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Id.* at 74.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

¶ 81          Defendant contends our review of this issue is *de novo* because the facts giving rise to discovery violation are not in dispute.  In support, defendant relies on *People v. Lovejoy*, 235 Ill. 2d 97, 919 N.E.2d 843 (2009).  In *Lovejoy*, the parties did not dispute that an expert failed to include a finding that a test produced a false negative and did not state her reason for the negative test in her report.  The supreme court concluded the issue was a question of law subject to *de novo* review. *Id.* at 118.  We note *Lovejoy* involved a discovery violation under Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001).  The State contends the supreme court applied a manifest weight standard of review in *Beaman*, 229 Ill. 2d at 72-73.  Indeed, the *Beaman* court addressed the standard of review as follows:

                    "The circuit court heard testimony on the *Brady* claim at
               the evidentiary hearing and found that the evidence on Doe as a

viable suspect was remote and speculative. In making that determination, the circuit court was required to weigh the evidence. Additionally, the assessment of materiality under *Brady* involves weighing the impact of the undisclosed evidence on the verdict. [Citation.] Accordingly, the *Brady* claim does not present a pure question of law. Rather, it requires applying established law to the facts, including those elicited at the evidentiary hearing. In these circumstances, we review the circuit court's decision for manifest error. [Citation.] Manifest error is error that is 'clearly evident, plain, and indisputable.' " *Id.* (quoting *People v. Morgan*, 212 Ill. 2d 148, 155, 817 N.E.2d 524, 528 (2004)).

The trial court in this case did not hear testimony on the *Brady* violation, but it did weigh the impact of the undisclosed evidence on the verdict. We need not resolve this dispute, because we conclude the court did not err under either standard of review.

¶ 82　　　　　　　Here, defendant argues the State's failure to disclose a four-page letter from Green to the Champaign County State's Attorney was a *Brady* violation. Defendant argues the letter was material because disclosure could have allowed counsel to (1) investigate an alternate suspect and (2) show the police conducted an inadequate investigation. The State argues defendant has forfeited this second argument by failing to raise it in the trial court. We agree. The record shows counsel clearly only argued the letter's materiality as to the possibility of defense counsel investigating and presenting evidence of an alternate suspect. We therefore turn to defendant's argument that the letter was material evidence he could have used to investigate

an alternate suspect and, had it been disclosed, there was a reasonable probability the result of the proceedings would have been different.

¶ 83 First, we note the trial court found the State clearly failed to disclose this letter. The State does not dispute this point and we accept the trial court's conclusion that there was a failure to disclose the letter. The letter contained a single line indicating that Cotton told Green he moved to Georgia because "KO" killed a person named "Rakeem." As the trial court noted, the letter was not a confession. The letter constituted hearsay about who Cotton thought killed a person named "Rakeem." Further, nothing in the letter indicated its disclosure would have led to the discovery of admissible evidence. It was undisputed that "KO" was a nickname for Anthony Fowler, a person defendant was aware of. Indeed, defendant disclosed his intent to present an alibi defense that he was with Fowler at the time of the shooting and Fowler's name was "mentioned all over the reports." Moreover, defendant notes the State disclosed evidence of a prior altercation between defendant, Fowler, and Vineyard, which gave Fowler motive and defense counsel reason to investigate Fowler as an alternate suspect.

¶ 84 Additionally, Cotton was listed as a witness by the State, he was made available to both parties, and the State tendered a statement from Cotton identifying defendant as the shooter. The letter did not indicate Cotton could testify to anything other than his own opinion, speculation, and hearsay. Although the letter indicated "KO" killed someone named "Rakeem," it is sheer speculation that its disclosure would have led to the discovery of admissible evidence to present Fowler as an alternative suspect or to attack the police investigation, particularly in light of the fact that Fowler's name was all over the reports and defendant was aware of Fowler's prior fight with Vineyard. We therefore conclude the trial court did not err when it determined

that defendant failed to demonstrate the undisclosed letter prejudiced him where the letter was not material to guilt or punishment. *Beaman*, 229 Ill. 2d at 73-74.

¶ 85                                          D. Rule 431(b)

¶ 86        Defendant next contends the trial court violated Rule 431(b) by collapsing the four essential, yet separate principles of Rule 431(b), and failing to adequately ensure that each juror understood and accepted each principle as required under Rule 431(b). Defendant failed to raise this issue before the trial court, thus rendering the issue forfeited. *People v. Kitch*, 239 Ill. 2d 452, 460-61, 942 N.E.2d 1235, 1240 (2011). However, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prevail under the plain-error doctrine, a defendant must first demonstrate a clear or obvious error occurred. *Piatkowski*, 225 Ill. 2d at 565. If an error occurred, we will only reverse where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* In considering whether the court committed a clear and obvious error with respect to its compliance with Rule 431(b), our review is *de novo*. *People v. Belknap*, 2014 IL 117094, ¶ 41, 23 N.E.3d 325.

¶ 87        Under Rule 431(b),

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a

- 28 -

reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 88        We first consider whether the trial court erred by asking about the four principles in compound form. In this case, during jury selection, the trial court read all Rule 431(b) principles in one list to the prospective jurors by articulating the following statements:

"The Defendant is presumed innocent of the charge against him. Before a Defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. The Defendant is not required to offer any evidence on his own behalf. And, if a Defendant does not testify, it cannot be held against him."

The court then asked each juror, "do you understand and accept each of those principles?" The record indicates the jurors answered in the affirmative.

¶ 89        In *People v. Willhite*, 399 Ill. App. 3d 1191, 927 N.E.2d 1265 (2010), this court considered whether the trial court violated Rule 431(b). This court held the trial court did not violate Rule 431(b) by asking the jurors if they understood the four principles in compound form. *Id.* at 1196-97. This court concluded the plain language of Rule 431(b) does not require separate

questions of the jurors about each individual principle. *Id.* "Nor does the rule require separate, individual answers from each juror." *Id.* at 1197.

¶ 90    Defendant relies on *People v. Thompson*, 238 Ill. 2d 598, 939 N.E.2d 403 (2010), in support of his argument. In *Thompson*, the supreme court found the trial court failed to comply with Rule 431(b), noting it entirely failed to address one of the four principles and did not ask the jurors if they both understood and accepted another principle. *Id.* at 607. The supreme court pointed out that Rule 431(b) requires the trial court to "address each of the enumerated principles" and to determine whether the jurors understood and accepted each of the principles. *Id.* In so holding, the supreme court noted the committee comments to the rule "emphasize that trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' " *Id.* (quoting Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997). The court further held the rule required a specific question and response process, but the questioning may be performed individually or in groups so long as there was an opportunity for a response from each juror. *Id.*

¶ 91    Nothing in *Thompson* requires the circuit court to address each principle individually. Rather, *Thompson* was concerned with the court's failure to address one principle entirely and to determine the jurors' acceptance of another principle. Moreover, the plain language of Rule 431(b) contains no requirement that the court must recite each principle separately when determining the jurors' understanding and acceptance of the principles.

¶ 92    We are not persuaded by defendant's reliance on *People v. McCovins*, 2011 IL App (1st) 081805, 957 N.E.2d 1194. First, to the extent this case interprets *Thompson* as requiring a trial court to question jurors about each principle individually, we disagree for the reasons discussed above. Second, *McCovins* is clearly distinguishable from this case. See *id.*

¶ 36 ("[T]he trial court failed to abide by the mandatory question and response process required by Rule 431(b). In contravention of Rule 431(b), the trial court merely provided the prospective jurors with a broad statement of legal principles interspersed with commentary on courtroom procedure and the trial schedule, and then concluded with a general question about the potential jurors' willingness to follow the law.").

¶ 93        Here, the trial court properly addressed each principle and provided each juror an opportunity to express whether they understood and accepted each principle. For the foregoing reasons, we conclude the court did not err by asking about the four principles in compound form, and the court's method of inquiry adequately ensured each juror understood and accepted each principle.

¶ 94                              E. *De Facto* Life Sentence

¶ 95        Finally, defendant argues he received a *de facto* life sentence without the trial court finding that he was permanently incorrigible for an offense that occurred when he was a juvenile, in violation of the eighth amendment. The State contends defendant's 40-year sentence is not a *de facto* life sentence.

¶ 96        *Miller v. Alabama*, 567 U.S. 460, 489 (2012), stands for the proposition that a court must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. A life sentence for a juvenile, whether mandatory or discretionary, is disproportionate and violates the eighth amendment unless the court considers the defendant's youth and its attendant characteristics. *People v. Holman*, 2017 IL 120655, ¶ 40, 91 N.E.3d 849. Therefore, an eighth amendment claim exists where a juvenile (1) received a "life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics ***." *People v. Buffer*, 2019 IL 122327, ¶ 27,

137 N.E.3d 763. The Illinois Supreme Court has held "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." *Id.* ¶ 41.

¶ 97 The State argues defendant's sentence of 40 years is not a *de facto* life sentence under the holding in *Buffer*. Defendant argues this court should include the three-year term of MSR and find the 43-year aggregate to be a *de facto* life sentence in violation of the eighth amendment. However, these arguments ignore the second part of a successful eighth amendment claim. An eighth amendment claim exists where a juvenile (1) received a "life sentence, mandatory or discretionary, natural or *de facto*, *and* (2) the sentencing court failed to consider youth and its attendant characteristics." (Emphasis added.) *Id.* ¶ 27. Here, the trial court thoughtfully considered all the relevant factors in aggravation and mitigation. The court's comments span more than 20 pages in the record. The court specifically and repeatedly addressed defendant's youth and its attendant characteristics. Therefore, it does not matter whether defendant's sentence constitutes a *de facto* life sentence because the court thoughtfully and extensively considered defendant's youth, as well as the other relevant factors in mitigation, and determined a 40-year term of imprisonment was appropriate. We appreciate the thorough and extensive comments made by the trial judge and conclude the 40-year term of imprisonment was not an abuse of discretion.

¶ 98                                III. CONCLUSION

¶ 99 For the reasons stated, we affirm the trial court's judgment.

¶ 100 Affirmed.