**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190375-U

Order filed October 25, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Knox County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0375 Circuit No. 18-CF-176 |
| JONATHAN I. KELLY, | ) ) ) | |
| Defendant-Appellant. | ) ) | Honorable Scott Shipplett, Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court.
Justices Holdridge and Hauptman concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The court did not err in denying defendant's motion for a mistrial. (2) Defendant forfeited the argument that the first degree murder and unlawful possession of a weapon by a felon charges should have been severed. (3) Defense counsel did not provide ineffective assistance. (4) The State's purported misconduct does not require reversal. (5) Cumulative error did not deprive defendant of his right to a fair trial. (6) Defendant's sentence is proper.

¶ 2     Defendant, Jonathan I. Kelly, appeals his convictions and sentences for first degree murder and unlawful possession of a weapon by a felon (UPWF). Defendant argues that (1) the court erred

by denying his motion for mistrial after the State failed to timely disclose a statement by one of its witnesses; (2) the court erred by allowing the State to try him for first degree murder and UPWF in the same trial because the introduction of the underlying felony for the UPWF charge prejudiced him; (3) defense counsel provided ineffective assistance by failing to request an accomplice witness jury instruction; (4) the prosecutor committed misconduct by telling jurors they would hear certain evidence and then failed to present it and improperly tried to lead its own witness in an attempt to elicit the evidence; (5) the cumulative effect of these errors deprive him of a fair trial; and (6) his 75-year sentence should be reduced or remanded for resentencing. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        The State charged defendant with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2018)) and one count each of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)) and UPWF (*id.* § 24-1.1(a)). Regarding the first degree murder charges, the indictment alleged that defendant personally discharged a firearm.

¶ 5        Prior to trial, the State filed a motion *in limine* seeking to introduce evidence of defendant's prior conviction for unlawful possession of a controlled substance in order to prove defendant's status as a felon to sustain the UPWF charge. Defense counsel acknowledged the State "should be allowed to introduce it" if the court was going to allow the State to proceed with the UPWF charge. He continued "[m]y objection is to them proceeding with the [unlawful use of a weapon by a] felon count wherein there is no weapon that's going to be produced at trial and I believe that the prejudicial effect of proceeding with that in conjunction with the murder trial outweighs the probative value." The State characterized this argument as a motion to dismiss the UPWF charge and the defense did not object to that characterization. The court granted the motion *in limine* and denied defendant's apparent motion to dismiss. After the State provided a copy of the sentencing

2

order it intended to introduce as evidence of the prior felony, defense counsel objected to the form because some features contained in the order in conjunction with other evidence that would be presented at trial would make defendant "look like more of a lawbreaker." The State offered to stipulate that defendant was a convicted felon and indicated that such a stipulation would then prevent the State from introducing the sentencing order. The court determined that either a redacted copy of the sentencing order could be introduced to the jury or defendant could stipulate to the prior felony.

¶ 6    The matter proceeded to a jury trial. During opening statements, the prosecutor told the jury that it would hear from Leonard McGee that he asked defendant what happened, and defendant said, "I fucked up."

¶ 7    Testimony during trial established that on April 1, 2018, Jenni McGruder, while outside of a pub, sustained a gunshot wound to the head that caused her death. Officers retrieved three shell casings from the scene. The three shell casings were fired from the same firearm. A bullet recovered from Jenni's body could have come from the shell casings. The area outside of the pub where the shooting took place was well lit.

¶ 8    Outside of the pub, as Michael McGruder was walking to Quincy Morrison's car with Jenni and Morrison, he heard two or three gunshots. While walking north, Michael heard the gunshots coming from behind him. He ducked and went to the ground. After getting up and realizing he was okay, he saw Jenni lying on her stomach. As he was standing over Jenni, a person in white and orange clothing ran past him. The person had a dark colored handgun on their "right side." The person deliberately displayed the gun toward Michael "sort of like taunting [Michael] with it." The person did not make any statements, but he smiled at Michael. Michael was not able to identify

the person from a photographic lineup. Michael also did not know if the photographic lineup contained a picture of defendant.

¶ 9 Morrison observed a commotion outside of the pub. He did not recognize anyone involved in that commotion and defendant was not part of the group involved. He overheard someone involved say they were going to get a gun "and shoot the place up." Morrison decided to leave the pub and attempted to get everyone he went to the pub with to leave. He, Jenni, and Michael began walking toward Morrison's car. Morrison heard tires squealing and when he turned around, he saw "sparks come flying from a gun." The sparks came from behind him, which was south of him. Morrison heard three gunshots. Morrison saw a van "[a]t the end where the shots came from." He ducked and began running toward his car. After he arrived at his car, he saw an individual run by him. Morrison identified this person as defendant. He knew defendant and was familiar with him from playing basketball with him. Defendant was running north. Morrison made eye contact with defendant and began yelling at defendant "that he was bogus, *** that he wasn't shit, that what he did was foul, and as [defendant] was running by he told [Morrison] that [Morrison] better not say anything." Defendant was wearing light-colored clothing and "was trying to cuff a gun into his pocket or his waistband." Morrison did not see a gun at that time but saw defendant putting something on his right side. He did not see defendant shoot a gun. Morrison had one alcoholic beverage while at the pub.

¶ 10 McGee admitted he had prior felony convictions and that he was on probation. He was familiar with defendant and had known him for approximately two years prior to the shooting. On the night of the shooting, McGee had one or two shots at a bar prior to going to the pub and had two shots at the pub. At the pub, McGee observed a fight between defendant and Garret Mixon. After the fight, defendant left the pub. McGee also left the pub, but received a call from defendant

4

telling him to return because associates of Mixon were trying to fight an associate of theirs, Sko. McGee returned and as he was walking toward the pub, he observed Sko with blood on his face. At that time, defendant pulled up in a white van. Defendant was the driver. The headlights were "beaming *** on Sko's face." Defendant "just jumped out, he jumped out the van and just started running and shooting." McGee saw defendant holding a black semiautomatic firearm. Defendant fired two or three shots. He was shooting north toward a crowd of people. McGee was approximately 10 feet from defendant when he exited the white van. When defendant was running and shooting McGee saw a body fall. Defendant ran north and ran past the person who fell.

¶ 11        McGee entered his car and picked up defendant. McGee stated that was "dumb," but he "was just calling myself trying to help somebody." McGee did not see a firearm when defendant entered McGee's car. He only saw defendant with a gun when defendant pulled up at the pub and started shooting. Defendant wanted McGee to take him out of town; McGee took defendant to a motel in Davenport, Iowa. McGee paid for defendant's motel room and gave him a prepaid phone. McGee did not see what happened to the white van. During the trip to the motel, defendant made a statement to McGee that "he couldn't believe that they provoked him." McGee testified that defendant did not make any other statements about his actions that night. The State then asked if McGee recalled defendant ever saying, "I messed up" or "I fucked up," and defense counsel objected on the basis of leading. The court sustained the objection and defendant did not provide an answer.

¶ 12        McGee spoke to police about the shooting in an interview that lasted approximately an hour. He admitted that he lied for approximately the first 45 minutes because he had concerns about being on probation and he was afraid. He clarified that he was not afraid to go back to the penitentiary but was afraid and nervous of what could happen. McGee noted that he was from the

5

streets, and he knew "what happened when things like this, you know, come into play as far as you having to testify in court on somebody." He was afraid of leaving his children. McGee was not promised anything for his testimony.

¶ 13    McGee did not recall telling police that defendant was wearing a dark sweatsuit and thought he told the police it was a gray jumpsuit. Prior to trial, McGee told Detective Kevin Legate that defendant told him that he could not believe they provoked him.

¶ 14    At the pub, Douglas Bailey observed a verbal altercation between Mixon and defendant. This altercation escalated and defendant struck Mixon with a barstool. Defendant then left the pub. Bailey received a call from McGee telling him to step outside because "they was jumping on a guy named Sko." Bailey went outside, and he saw a white van pull up. Bailey "observed [defendant] get out the van and open fire." Bailey initially testified that defendant exited the driver's side but then stated he did not know if it was the driver's or passenger side "but I know that he stepped out that van and started shooting." The firearm "was like a[n] automatic grayish looking." Defendant fired two or three shots toward the north. Bailey did not see who, if anyone, drove the van away. Bailey was in a rush to leave and was concerned for his safety. Bailey could not say if defendant took off running, got picked up, or drove away in the van. Bailey testified that "[t]here's no doubt in my mind that [defendant] shot the two to three rounds." Bailey did not see anyone else in possession of a firearm or hear anyone else firing a weapon that night. Bailey did not have anything to drink that night.

¶ 15    Gregory Bridges went to the pub on the night of the shooting. He consumed one shot of alcohol. When he exited, he saw a white van driving slowly through the parking lot. Bridges made eye contact with the driver. The van made a sudden stop and defendant jumped out of it. Defendant had his hand near his waist area and then raised his arm and extended it. Bridges saw a flash and

6

smoke. He saw defendant holding a gun. Bridges had not seen defendant previously. He believed he heard "[m]aybe five or six" gunshots but he was not counting. Bridges was traumatized. After the gunshots, the van left. Bridges could not recall seeing anyone enter the van. He assumed defendant entered the van, but he did not know. Bridges admitted that he told Legate that defendant reentered the van and drove away but testified that he assumed it. He stated that he did not see the person that shot the gun run north but added that "everything was almost like it *** wasn't real." Bridges did not see anyone else with a firearm.

¶ 16        Detective Lane Mings travelled to Sioux Falls, South Dakota to collect defendant and transfer him to Knox County.

¶ 17        The State introduced into evidence a certified copy of defendant's sentencing order for his conviction of unlawful possession of a controlled substance. A redacted version of this document was published to the jury. It showed that defendant pled guilty to "PCS", a Class 4 felony, and was dated January 10, 2018.

¶ 18        Out of the presence of the jury, defense counsel moved for a mistrial based upon the fact the State had not previously disclosed the statement defendant made to McGee that he was provoked. Counsel indicated that he would be calling Legate in his case-in-chief, but he did not believe that would cure the error. Defense counsel further argued that the statement was powerful because it ascribed a motive to his client. The prosecutor responded that he believed McGee told him about the statement the day prior during witness preparation, but he did not realize that it was not included in the reports—in the statement McGee had given to Legate. He further advised the court that he was not trying to hide anything and had neglected to put it in an additional disclosure made the prior afternoon. The prosecutor apologized. The court noted that with a lay witness who lied to police for 45 minutes of an hour-long interview, there are bound to be things that come out

during witness preparation that were not previously disclosed to the police. Further, the court did not believe that the State's nondisclosure was purposeful. The court advised that it would give the defense an opportunity to recall McGee to further inquire into the matter. It denied the motion for a mistrial.

¶ 19 Defense counsel called Legate as a witness. Legate spoke with McGee on April 2 for approximately one hour. During that time, McGee never told Legate that defendant told McGee that they should not have provoked him.

¶ 20 The court instructed the jury that neither opening nor closing statements are evidence and any argument not based upon the evidence should be disregarded. It instructed the jury that the State must prove the proposition that during the commission of first degree murder, defendant was armed with a firearm and that if it finds the State proved the allegation, it should sign the verdict form indicating the allegation was proven. As to aggravated discharge of a firearm, the court told the jury that the State must prove defendant knowingly discharged a firearm in the direction of another person. Further, the court instructed the jury that it had heard evidence that defendant made statements related to the offenses, and it was for them to determine whether defendant made the statements and what weight to give the statements, considering all the circumstances under which it was made. Additionally, that evidence that a witness had been convicted of an offense may be considered as it may affect the believability of that witness. The court also instructed the jury that defendant's prior conviction could only be considered for the purpose of determining whether the State proved the proposition that defendant was previously convicted of unlawful possession of a controlled substance. Defendant did not tender, and the court did not give, the accomplice witness jury instruction.

8

¶ 21    The jury found defendant guilty and specifically found that the State proved the allegation that defendant was armed with a firearm during the commission of first degree murder. Defendant moved for a new trial arguing, among other things, that the court (1) "allowed the State to proceed with a [UPWF] Count over objection" and that "[t]he introduction of the prior Felony was more prejudicial than probative"; and (2) erred in denying the motion for mistrial. Counsel did not provide any argument on these allegations during the hearing on the motion. The court noted that it had provided defendant an opportunity to stipulate to the prior felony, which the defense rejected. The court denied the motion.

¶ 22    At sentencing, the State presented victim impact statements. In providing his recommendation, defense counsel stated that there was a "minimum of 45" for the first degree murder charge and requested that minimum. He agreed that the sentence on the UPWF charge was mandatorily consecutive and requested the minimum on that charge as well.

¶ 23    The court stated that it considered the testimony presented, the trial evidence, the presentence investigation report (PSI), the history, character and attitude of defendant, the evidence and arguments, and the statutory factors in aggravation and mitigation. The court determined that none of the statutory mitigating factors applied. It concluded that the statutory aggravating factors that applied were that defendant has a prior history of delinquency or criminal activity and that a sentence is necessary to deter others. The court noted that defendant's criminal history was not significant and "not very big" for a 29-year-old. Defendant had two theft charges and a "small amount of a controlled substance." As to the need to deter others, the court noted that was particularly important in this case.

¶ 24    The court set forth that the first degree murder conviction carried a 20 to 60-year sentence and there was a mandatory 25-year firearm enhancement. The UPWF conviction carried a 2 to 10-

9

year sentence. The aggravated discharge of a firearm conviction merged into the first degree murder conviction.

¶ 25    Specifically talking about the UPWF charge, the court noted that if defendant had not broken that law, they would not be talking about a murder case. The court then directly referenced the aggravating factor of the need to deter others and stated that was very important and necessary. It noted that this was a crime of passion and opportunity that presented itself to defendant in the situation where he had access to a firearm. The court stated that there was a mandatory prison sentence even for persons who did not commit murder and that a felon simply having a weapon is an automatic two years in prison. Ultimately, the court determined that the maximum sentence of 10 years' imprisonment was "an appropriate sentence in this case because, again, the *** possession of a weapon by a felon was the very first step in the domino effect that led to Jenni McGruder losing her life that night."

¶ 26    As to the murder charge, the court noted the impact on Jenni's family, as well as the community. It believed it should sentence defendant under the murder charge that required the least mental thought behind the crime because the court thought defendant's conduct was reckless. The court did not believe defendant had any animus toward Jenni, but instead that he "just sent some rounds downrange and without really much of a thought as to the potential consequences, although [defendant] knew or should have known that *** would create a strong probability of death or great bodily harm." It stated that it "considered as dispassionately as [it] could the defendant's prior record, the facts presented in the [PSI]" and determined that a mid-range sentence of 40 years' imprisonment was appropriate. The court also found that the 25-year mandatory firearm enhancement was appropriate and required.

10

¶ 27 Defense counsel filed a motion to reconsider sentence, arguing the sentence was excessive as it was essentially a life sentence and provided no reason for defendant to attempt to rehabilitate himself. Further, that the sentence did not adequately reflect the mitigation evidence. Additionally, he argued that the court deemed defendant's conduct reckless and that a *de facto* life sentence for a reckless act is excessive. The court denied the motion. In doing so, the court noted that this was a horrific crime and the legislature put a significant penalty on it. Additionally, it stated that it was not the worst murder the court had seen but also was not the least culpable murder such that a mid-range sentence was appropriate for the murder and that is what the court gave defendant. Defendant appeals.

¶ 28                                                    II. ANALYSIS

¶ 29                                                    A. Mistrial

¶ 30 Defendant argues that the court erred by denying his motion for mistrial based upon the State's failure to disclose defendant's statement to McGee that he was provoked.

¶ 31 "The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). A mistrial is appropriate "where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *Id.* "Whether a new trial is warranted by the discovery violation depends on several factors." *People v. Morgan*, 112 Ill. 2d 111, 135 (1986). When the State has failed to disclose evidence, the "case must be examined in order to determine whether the State's failure was harmless, just as in any other situation in which the ultimate question is one of harmlessness." *People v. Weaver*, 92 Ill. 2d 545, 560 (1982). Factors to consider are "[t]he strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, the feasibility of continuance rather than a more

11

drastic sanction, and the wilfulness of the State in failing to disclose." *Id.* "The closer the evidence, the stronger is the case for excluding the statement or declaring a mistrial." *Id.*

¶ 32　　　　The State admits there was a discovery violation but asserts a mistrial was not warranted. We agree. The undisclosed evidence—defendant's statement to McGee that he was provoked— was not strong evidence. While it gave some insight into a motive, testimony from Bailey and McGee already presented that motive when they indicated that defendant had been in a fight with Mixon and that another associate of theirs, Sko, was being attacked. McGee also indicated that the people attacking Sko were associated with Mixon. Prior notice would not have helped the defense discredit the statement. Defendant was able to elicit testimony from Legate that McGee had not told him about defendant's statement regarding provocation when Legate interviewed McGee on April 2. Additionally, the court determined that the State did not willfully fail to disclose the statement and there is nothing in the record to undermine that determination. Finally, the evidence in this case is not close. Three witnesses—McGee, Bailey, and Bridges—positively and unequivocally identified defendant as the shooter. A fourth witness, Morrison, did all but explicitly identify defendant as the shooter. Moreover, the five witnesses to the shooting gave mostly consistent accounts of the shooting. Based on the foregoing, the court did not abuse its discretion in denying a mistrial.

¶ 33　　　　　　　　　　B. Failure to Sever the UPWF and Murder Charges

¶ 34　　　　Defendant argues that the court erred in allowing the State to try him for UPWF and murder in the same trial because he was prejudiced by the jury being informed of his prior felony conviction.

¶ 35　　　　The parties dispute whether this issue was properly preserved. To preserve an error for appellate review, a defendant must object to the error at trial and raise it in his posttrial motion.

*People v. Enoch*, 122 Ill. 2d 176, 186 (1988). "[I]t is the defense that must move for a severance." *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996).

¶ 36    Here, defendant faults the circuit court for failing to sever the UPWF and murder charges and although defendant argues that he objected to the charges being tried together prior to trial and in a motion for new trial, the record reveals that he never moved for a severance of those charges. Instead, defendant objected to the introduction of his prior felony conviction and moved to dismiss the UPWF charge rather than seek a severance. The State characterized his pretrial objection as a motion to dismiss and the court analyzed it as such. Defendant did not challenge that characterization or the court's analysis. Moreover, defendant's motion for new trial failed to raise an issue of severance. In the motion, defendant simply states that the court allowed the State to proceed on the UPWF charge over an objection and the introduction of the prior felony was prejudicial. During the hearing on the motion, defendant made no argument that the court should have severed the charges. Based on the foregoing, we conclude that defendant forfeited this issue. See *Enoch*, 122 Ill. 2d at 186.

¶ 37    Even if defendant had not forfeited this issue and could establish that it was an abuse of discretion not to sever the charges (see *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 68 (providing that the decision whether to sever charges is reviewed for an abuse of discretion)), we would find any such error harmless. Specifically, considering the strength of the evidence and the fact that the court gave an instruction limiting the jury's consideration of defendant's prior felony, the outcome of the trial would not have been different if the State did not introduce defendant's prior conviction for possession of a controlled substance. See *People v. Burnfield*, 295 Ill. App. 3d 256, 263 (1998) ("An error is considered harmless where the reviewing court can conclude that absent the error the outcome of the trial would not have been different."); *People v. Sims*, 2019 IL

App (3d) 170417, ¶ 49 ("Jurors are presumed to follow the instructions provided by the trial court.").

¶ 38                                    C. Ineffective Assistance of Counsel

¶ 39        Defendant argues that defense counsel provided ineffective assistance by failing to request an accomplice witness jury instruction in response to McGee's testimony, which he alleges implicated McGee in the planning of the offense.

¶ 40        "[T]o prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial." *People v. Horton*, 143 Ill. 2d 11, 23 (1991). "To show actual prejudice, defendant must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377, (2000). "[I]f [an] ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Griffin*, 178 Ill. 2d 65, 74 (1997).

¶ 41        The accomplice witness jury instruction states that "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014). The committee notes to the instruction provide

14

"[t]he defendant is entitled to have Instruction 3.17 given to the jury (1) if the witness, rather than the defendant, could have been the person responsible for the crime, or (2) if the witness admits being present at the scene of the crime and could have been indicted either as a principal or under a theory of accountability, but denies involvement." *Id.*

¶ 42 Here, regardless of whether the accomplice witness instruction would have been warranted, and it is not clear that it would have, defendant cannot establish that he was prejudiced by counsel's failure to seek the instruction because there is no reasonable probability that the provision of the instruction would have changed the outcome of the trial. As stated above, the evidence in this case was not close. *Supra* ¶ 32. The jury was already instructed that prior convictions, which McGee had, could be considered regarding a witness's believability. Most importantly, the jury would have been instructed to examine McGee's testimony in light of the other evidence in the case, which largely corroborated McGee's testimony and would therefore bolster his credibility rather than undermine it. For example, in addition to McGee (1) two witnesses positively identified defendant as the shooter and another witness did all but directly identify defendant as the shooter; (2) two witnesses observed defendant exit a white van, and another witness observed a van near where the shots came from; (3) three witnesses heard two or three gunshots; (4) one witness corroborated that defendant had been in a fight with Mixon, and Sko was being attacked by Mixon's associates; and (5) one witness corroborated that defendant ran north and another indicated that a person with a gun ran north.

¶ 43 Defendant relies heavily upon *People v. Wheeler*, 401 Ill. App. 3d 304 (2010), to support his argument that he was prejudiced by counsel's failure to tender the accomplice witness instruction. In that matter, the court found counsel's deficient performance in failing to tender the

15

instruction prejudicial because the State's case "hinged on" the alleged accomplice's testimony. *Id.* at 314. The court noted that the alleged accomplice was the State's key witness, who was the only eyewitness that could identify defendant as the shooter and identify defendant's car. *Id.* Contrary to *Wheeler*, the State's case in this matter did not hinge on McGee's testimony.

¶ 44                                  D. Prosecutorial Misconduct

¶ 45        Defendant argues that the prosecutor engaged in misconduct by telling the jury it would hear that defendant told McGee that he "fucked up" but failed to produce such evidence and compounded that error by asking McGee a leading question in that regard.

¶ 46        Defendant failed to preserve this issue but argues it is reversible plain error because the evidence is closely balanced. The plain error doctrine allows a forfeited error to be reviewed when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *People v. Belknap*, 2014 IL 117094, ¶ 48. Generally, the first step in applying the plain error doctrine is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. However, "[w]here the only basis proffered for plain-error review is a claim that the evidence is closely balanced" the reviewing court may bypass the error determination when the closely balanced analysis is dispositive. See *People v. White*, 2011 IL 109689, ¶ 148.

¶ 47        Here, the evidence is not closely balanced. Specifically, as set forth above (*supra* ¶¶ 32, 42), multiple witnesses identified defendant as the shooter and their accounts were generally consistent. See, *e.g.*, *People v. Brooks*, 187 Ill. 2d 91, 133 (1999) (providing that discrepancies between multiple witnesses' statements are "to be expected anytime several persons witness the same event under traumatic circumstances"); *Sebby*, 2017 IL 119445, ¶ 53 (stating that when determining whether the evidence is closely balanced, "a reviewing court must evaluate the totality

16

of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case"). This evidence readily established defendant's guilt of murder, aggravated discharge of a firearm, and UPWF.

¶ 48   Alternatively, defendant argues that counsel provided ineffective assistance by failing to object to the misconduct and preserve the issue for appellate review. Notably, counsel did object to the leading question, and the court sustained counsel's objection. Counsel, however, failed to include the issue in a posttrial motion or otherwise address in the circuit court the State's failure to present the evidence it told jurors it would hear in opening statements. Even if counsel had preserved the issues, they fail on the merits such that defendant has suffered no prejudice from counsel's failure. See *Griffin*, 178 Ill. 2d at 74.

¶ 49   "[I]t is improper for counsel to make opening statements about testimony to be introduced at trial and then fail to produce that evidence." *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). But "[r]eversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor *and* result in substantial prejudice to the defendant." (Emphasis in original.) *Id.*

¶ 50   Here, there is no evidence in the record that the prosecutor's opening comments were attributable to deliberate misconduct. The prosecutor's attempt to elicit the statement from McGee, which defense counsel objected to, indicates that the prosecutor intended to introduce the evidence it referenced in opening statement such that its failure to do so was not deliberate. Further, considering the strength of the evidence, (*supra* ¶¶ 32, 42) it cannot be said that defendant was substantially prejudiced by the opening statement and the attempt to elicit the evidence through the leading question. Additionally, any potential prejudice was limited by the court's instruction

to the jury that opening statements are not evidence. See *Sims*, 2019 IL App (3d) 170417, ¶ 49. Counsel was not ineffective for failing to preserve this meritless issue.

¶ 51                                                   E. Cumulative Error

¶ 52        Defendant argues that if the above alleged errors do not individually require reversal, the cumulative effect of the errors requires reversal because they created a pervasive pattern of unfair prejudice which denied him the right to a fair trial.

¶ 53        "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). However, "[i]f the alleged errors do not amount to reversible error on any individual issue, generally there is no cumulative error." *Id.* "[A] defendant in a criminal case is entitled to a fair trial, not a perfect one." *People v. Ruiz*, 94 Ill. 2d 245, 260 (1982). The question the court asks, is "whether a substantial right has been affected to such a degree that we cannot confidently state that defendant's trial was fundamentally fair." *People v. Blue*, 189 Ill. 2d 99, 138 (2000).

¶ 54        Here, some of defendant's contentions are not error and those that are erroneous do not amount to reversible error. After reviewing the record, we cannot say that the purported errors affected defendant's substantial rights to such a degree that his trial was not fundamentally fair and therefore, reversal is not warranted.

¶ 55                                                   F. Sentencing

¶ 56                                            1. *Apprendi* Violation

¶ 57        Defendant argues that the court erroneously imposed a 25-year mandatory firearm enhancement due to defendant personally discharging a firearm where the jury was only asked to

18

determine whether defendant was armed with a firearm, which only results in a 15-year enhancement. See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Defendant acknowledges he forfeited this error but argues that it may be corrected as a plain error because the evidence is closely balanced. We begin by determining whether the court erred. *Sebby*, 2017 IL 119445, ¶ 49

¶ 58        Section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections requires the imposition of a 25-year sentence enhancement where a defendant discharges a firearm during the commission of a murder. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018). Before imposing this firearm enhancement, the jury must find the evidence established beyond a reasonable doubt that defendant discharged a firearm in the commission of the murder. *Apprendi*, 530 U.S. at 490; *People v. Alexander*, 2017 IL App (1st) 142170, ¶ 47. *Apprendi* violations may be reviewed under the closely balanced prong of the plain error doctrine. *People v. Nitz*, 219 Ill. 2d 400, 414-16 (2006).

¶ 59        Initially, we note that while the State acknowledges that an *Apprendi* violation occurred, it is not entirely clear from the record that there was one. The jury found defendant guilty of aggravated discharge of a firearm, which necessarily required the jury to find beyond a reasonable doubt that defendant knowingly discharged a firearm. See 720 ILCS 5/24-1.2(a)(2) (West 2018). Regardless, the evidence regarding whether defendant personally discharged a firearm is not close. Three witnesses testified that defendant discharged a firearm, and none of the witnesses testified that they observed any other individual with a firearm at the time of the shooting. Therefore, we find no reversible plain error regarding the court's imposition of the 25-year firearm enhancement.

¶ 60                                2. Improper Aggravating Factor

¶ 61        Defendant argues that in sentencing him for UPWF the court took into consideration an improper aggravating factor, his prior felony conviction for unlawful possession of a controlled substance, because that conviction is an element of the offense. He also appears to argue that the

court improperly considered the murder as an aggravating factor. Defendant acknowledges he forfeited this issue but requests review under the second prong of the plain error doctrine. Under that prong, a reviewing court may remedy a "clear or obvious" error when "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in applying the plain error doctrine is to determine if an error occurred. *Id.*

¶ 62 In determining whether the court based the sentence on an improper aggravating factor, "a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense." *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). "Such dual use of a single factor is often referred to as a 'double enhancement.' " *Id.* at 12. It is defendant's burden to show that the circuit court considered an improper factor in determining a sentence. *People v. Grant*, 2019 IL App (3d) 170185, ¶ 28. "[T]he double-enhancement rule prohibits a single factor from being used twice with respect to the *same offense*" and there is no "principle that prohibits the use of a single factor with respect to separate and distinct offenses." (Emphasis in original.) *Phelps*, 211 Ill. 2d at 17. " '[T]he nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant' " may be considered in sentencing a defendant. *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986) (quoting *People v. Hunter*, 101 Ill. App. 3d 692, 694 (1981), quoting *People v. Tolliver*, 98 Ill. App. 3d 116, 117-18 (1981)). "On appeal, a reviewing court will not vacate a sentence that was based upon an improper factor and remand for resentencing if the reviewing court can determine

20

from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *Grant*, 2019 IL App (3d) 170185, ¶ 28.

¶ 63     In setting forth the aggravating factors applicable to defendant's crimes, the court referenced defendant's criminal history. This history included, among other things, the conviction underlying defendant's UPWF conviction. The court specifically stated that the history was not significant. Further, when addressing the reasoning for defendant's UPWF sentence, the court did not explicitly reference or rely on defendant's conviction for unlawful possession of a controlled substance. Instead, the only aggravating factor the court highlighted was the need to deter others. Any reference to defendant being a felon was simply a reference to the nature of the offense, Considering the record, we find the court did not improperly consider defendant's prior unlawful possession of a controlled substance conviction. At most, the record establishes that the court gave insignificant consideration to this prior offense. Additionally, the court properly considered defendant's criminal history, which included the conviction underlying the UPWF conviction. See *People v. Brown*, 2018 IL App (1st) 160924, ¶ 21 (stating that "although Brown's prior [unlawful use of a weapon by a felon (UUWF)] conviction was used as a predicate offense for the [armed habitual criminal] conviction, the trial court could properly consider the UUWF conviction as part of Brown's criminal history") (citing *People v. Thomas*, 171 Ill. 2d 207, 227-228 (1996)).

¶ 64     We further find that the court did not err in considering the murder and/or shooting as an aggravating factor in sentencing defendant on the UPWF charge. Specifically, the UPWF charge and the murder charge are separate offenses and the double-enhancement rule only "prohibits a single factor from being used twice with respect to the *same offense*." (Emphasis in original.) *Phelps*, 211 Ill. 2d at 17. Therefore, the court properly considered the underlying murder and/or shooting as it determined defendant's sentence for UPWF.

¶ 65    Based on the foregoing, we find no error, and as a result, no plain error.

¶ 66                                    3. Excessive Sentence

¶ 67    Defendant argues that his 40-year sentence for murder was excessive because the court found that his conduct was reckless. Defendant also argues that his 40-year and 10-year sentences for murder and UPWF were excessive because the court failed to properly consider mitigating evidence and defendant's potential for rehabilitation and placed undue weight on retribution.

¶ 68    "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). A reviewing court "must not substitute its judgment for that of the trial court simply because the reviewing court would have weighed the factors differently." *Id.* at 800-01. A sentence that falls within the statutorily prescribed range is presumptively valid (*People v. Busse*, 2016 IL App (1st) 142941, ¶ 27), and "is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense" (*People v. Franks*, 292 Ill. App. 3d 776, 779 (1997)). "Importantly, it is the seriousness of the crime—rather than the presence of mitigating factors— that is the most important factor in determining an appropriate sentence." *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12. The sentencing "court is not required to give defendant's rehabilitative potential more weight than the seriousness of the offense." *People v. Nussbaum*, 251 Ill. App. 3d 779, 781 (1993). We presume the circuit court considered the relevant factors and mitigating evidence presented. *People v. Wilson*, 2016 App (1st) 141063, ¶ 11.

¶ 69    First degree murder carries a sentencing range of 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2018). UPWF carries a sentencing range of 2 to 10 years' imprisonment. 720 ILCS 5/24-1.1(e) (West 2018). Defendant's sentences of 40 years' imprisonment for first degree murder and 10 years' imprisonment for UPWF are within the statutory ranges and are

22

presumptively valid. See *Busse*, 2016 IL App (1st) 142941, ¶ 27. Further, the record does not rebut this presumption, as the court explicitly stated that it considered all the evidence, the PSI, and the mitigating and aggravating factors. Defendant would like this court to place more weight on his rehabilitative potential, but this court is not to reweigh the factors on appeal. See *People v. Hageman*, 2020 IL App (3d) 170637, ¶ 19 ("It is not our duty on appeal to reweigh the factors involved in the circuit court's sentencing decision.").

¶ 70    While defendant claims that the mid-range sentence of 40 years was excessive, as the court termed his conduct reckless, he overlooks that the court also noted during the hearing on defendant's motion for reconsideration that the murder was neither the most nor least culpable murder the court had seen such that a mid-range sentence was appropriate. Thus, the court clearly took into consideration the fact that it believed defendant's conduct was reckless.

¶ 71    The court's comment that the murder would not have happened had defendant not committed the offense of UPWF does not indicate that it placed undue weight on retribution. Rather, the circuit court must weigh the relevant factors and this comment establishes that the court considered the nature and the circumstances of the offense—there certainly is a difference in the circumstances of a UPWF offense that results in death and the circumstances of an UPWF offense when no one is harmed. Based on the foregoing, defendant's sentences are not excessive.

¶ 72                                    III. CONCLUSION

¶ 73    For the foregoing reasons, we affirm the judgment of the circuit court of Knox County.

¶ 74    Affirmed.

23